UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

THEODORE O. WILSON III,                          :

                Plaintiff,            :

  -v.-                                           :

C.O. FERNANDO CALDERON et al.,                    :

              Defendants.           :

-------------------------------------------------------------X

<u>AMENDED</u>
<u>REPORT AND</u>
<u>RECOMMENDATION</u>

14 Civ. 6209 (GBD) (GWG)

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

Plaintiff Theodore O. Wilson III brought this action <u>pro se</u> under 42 U.S.C. § 1983

against defendants Corrections Officers ("C.O.") Fernando Calderon, Rosa Elliot, Christopher

Kinloch, Dale Moore, and John Doe and Captains N. France and Bramwell to recover damages

for alleged deprivations of his constitutional rights at Rikers Island while he was a pretrial

detainee. Defendants have moved for summary judgment.[1] For the reasons stated below, this

---

[1] <u>See</u> Notice of Motion, filed Sept. 16, 2016 (Docket # 128); Notice to Pro Se Litigant who Opposes a Motion for Summary Judgment, filed Sept. 16, 2016 (Docket # 129); Defendants' Statement of Material Facts Pursuant to Local Civil Rule 56.1, filed Sept. 16, 2016 (Docket # 130) ("Defs. 56.1"); Declaration of Erin Ryan, filed Sept. 16, 2016 (Docket # 131) ("Ryan Decl."); Memorandum of Law in Support of Defendants' Motion for Summary Judgment, filed Sept. 16, 2016 (Docket # 132) ("Defs. Mem."); Certificate of Service by Mail, dated Oct. 5, 2016, filed Oct. 12, 2016 (Docket # 135) ("Certificate of Service"); Notice of Plaintiff's Exhibits and First Responses to Defendants Summary Judgment (9/16/16), filed Oct. 12, 2016 (Docket # 136) ("Pl. Responses"); Declaration of Theodore O. Wilson, III, filed Oct. 12, 2016 (Docket # 137) ("Wilson Decl. I"); Letter dated Aug. 3, 2014, filed Oct. 12, 2016 (Docket # 138) ("Pl. Letter"); The Second(2nd)Declaration of Theodore O. Wilson, III, filed Oct. 18, 2016 (Docket # 139) ("Wilson Decl. II"); Letter dated Oct. 12, 2016 re: "This 'E13-E18' goes to my previous submissions", filed Oct. 18, 2016 (Docket # 140) ("Pl. Letter II"); Certificate of Service of 2nd Responses to Defendants' Summary Judgment Motion, dated Oct. 8, 2016, filed Oct. 19, 2016 (Docket # 141) ("Pl. 2d Responses"); Letter from Theodore O. Wilson, III, dated Oct. 15, 2016, filed Oct. 24, 2016 (Docket # 142) ("Pl. 3d Responses"); Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment, filed Nov. 9, 2016 (Docket # 146) ("Defs. Reply").

This Court previously noted that it would only consider filings postmarked on or before October 18, 2016, as timely filed. <u>See</u> Order, filed Oct. 27, 2016 (Docket # 144). Thus, Notice

motion should be granted in part and denied in part.

I. BACKGROUND

    A. Treatment of Plaintiff's Submissions

While defendants ask that we deem facts in their Rule 56.1 statement admitted because Wilson did not follow the procedures set forth in Rule 56.1 and in Local Civil Rule 56.1, see Defs. Reply at 2-3, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001), abrogated on other grounds by Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009). In light of Wilson's pro se status, we will not penalize him for his failing to submit a proper counterstatement under Local Civil Rule 56.1. See, e.g., Mateo v. Bristow, 2014 WL 4631569, at *1 (S.D.N.Y. Sept. 17, 2014) ("Given that [plaintiff] is proceeding pro se and made an effort to respond to the motion for summary judgment by submitting an affidavit, this Court exercises its discretion to excuse [plaintiff's] failure to the extent that [plaintiff] has provided admissible evidence controverting the facts in defendants' Rule 56.1 statement."); Wali v. One Source Co., 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009) ("[W]here a pro se plaintiff fails to submit a proper [opposing statement] . . . , the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions."). Thus, unless otherwise noted, the following facts reflect statements made by Wilson in his sworn filings and deposition testimony, as well as evidence submitted by defendants where not contradicted by

_____

of Plaintiff's Confirmation and Correction Addendum, filed Oct. 31, 2016 (Docket # 145) and Notice of Plaintiff's Reference Points for Summary Judgment (9/16/16)*, dated Nov. 8, 2016, filed Nov. 18, 2016 (Docket # 147), are untimely as they were postmarked on October 26, 2016, and November 14, 2016, respectively. Nevertheless, we consider these documents to the extent they clarify Wilson's previous arguments and do not advance new substantive claims. Were we to consider these documents as timely filed, they would not affect our disposition of this case.

Wilson's evidence.[2]  While defendants have pointed to a few instances where Wilson's

deposition testimony and later sworn statements are contradictory, none of these contradictions

are material to our resolution of this case.  Nevertheless, where Wilson's sworn statements

contradict his deposition testimony, we accept as truthful the statements in his deposition.  See

Hayes v. N.Y.C. Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an

issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by

omission or addition, contradicts the affiant's previous deposition testimony.").

B.  Facts

1.  The February 27 Incident

On February 27, 2012, Wilson was a pretrial detainee incarcerated at the George

Motchan Detention Center ("GMDC") at Rikers Island, New York.  Deposition of Theodore O.

Wilson, III, dated Apr. 28, 2016 (attached as Ex. C to Ryan Decl.) ("Wilson Dep."), at 48.  That

evening, Wilson and others from his housing block were escorted by C.O. Elliot from their cells

to GMDC's medication dispensary booth.  Id. at 52.  The hallway between Wilson's housing

block and the medication booth contains a metal detector called a "magnetometer," which

---

[2]  Wilson submitted a set of documents with consecutively numbered pages of E1
through E26 and another document with pages numbered F1-10. See Wilson Decl. I at E1-E8;
Pl. Responses at E9-E12; Pl. Letter II at E13-E18; Pl. 3d Responses at E19-E26; Wilson Decl. II
at F1-F10.  We accept all of these documents as sworn under penalty of perjury because Wilson
made plain on the first page of each set that this was his intention.  See Wilson Decl. at E1 ("I,
Theodore O. Wilson, III, do duly and solemnly declare, under the penalty of perjury, that the
subsequent matters are true and correct . . . .") (internal citation omitted); Wilson Decl. II at F1
("I duly declared the subsequent facts to be true and correct, under the penalty of perjury . . . .");
see also Pl. Letter II ("This 'E13-E18' goes to my previous submissions").

The Court notes that Wilson, somewhat confusingly, has also used the prefix "E" as a
page numbering system for certain exhibits.  See Pl. Letter at E1-E2, E7-E8; Certificate of
Service at E9-E13; Pl. Responses at E14-E20.

corrections officers sometimes require detainees to walk through on their way to or from another area of the detention center.  See id. at 60-61.  Should the magnetometer make a sound, the corrections officers "pull [the detainee] over and search [him]," making him take off his belt and his shoes, "just [to] find out what's the source of making the detector ring."  Id. at 62.  Wilson and the other detainees walked around the magnetometer on the way to the medication booth, but had to walk through it on the way back to their housing block.  Id. at 61-62.

While second in line to walk through the magnetometer, Wilson started laughing at something his friend "Miami" said while in front of Wilson.  Compl. Add. at 1.[3]  Captain France stopped Wilson and asked him "what are you laughing about?!"  Id. (capitalization omitted); see also Wilson Dep. at 65.  Wilson said that he was laughing at an inside joke, to which Captain France responded "you think I'm funny, you think I'm a joke[?]" Wilson Dep. at 70.  Captain France demanded Wilson stand against the wall and "place [his] arms all the way back all the way back up the wall."  Compl. Add. at 1 (capitalization and internal quotation marks omitted).  C.O.s Calderon, Kinloch, and Moore were also present.  Defs. 56.1 ¶ 9 (citing Use of Force Report, dated Mar. 13, 2012 (attached as Ex. D to Ryan Decl.) ("Use of Force Report")).  C.O. Calderon patted Wilson down, threw Wilson's shoes down the hallway, and removed Wilson's medications from his pocket and threw them in the trash.  Compl. Add. at 1-2; Wilson Dep. at 65-66; Wilson Decl. I at E3.  The C.O.s ordered Wilson to go through the magnetometer and then place his hands back on the wall.  Wilson Dep. at 66, 74.  Wilson passed through the

<hr>

[3]  In citing Wilson's complaint, see Complaint Under the Civil Rights Act, 42 U.S.C. § 1983, filed Aug. 6, 2014 (Docket # 1) ("Compl."),we refer collectively to documents identified on the ECF system as Docket # 1 (i.e. "Complaint") and Attachment 1 (i.e. "Complaint Part 2") as "Compl."  We refer to the document identified on the ECF system as Attachment 2 (i.e."Complaint Part 3") as "Compl. Add."

magnetometer, which did not beep, and placed his hands on the wall as instructed.  Id. at 66; see also id. at Corrections to Deposition ("I said — it never beeped.").

Because Wilson's arms began to tire, he decided to slide his hands down the wall instead of keeping them all the way up.  Compl. Add. at 1; Wilson Dep. at 67; Pl. Letter II at E18. Captain France told Wilson "I give you the green-light!" and "take your hands off of that wall again, I dare you . . . ."  Compl. Add. at 1 (capitalization and internal quotation marks omitted); see also Wilson Decl. I at E4; Wilson Decl. II at F5.  An altercation then occurred between Wilson and C.O. Calderon.  See Compl. Add. at 1; Defs. 56.1 ¶ 12.  Wilson says that C.O. Calderon punched him in the back of the head first, and then the other officers joined in, "swinging wildly" so that "[m]ost of their punches were missing and they were hitting each other because there were so many of them, they were close range."  Wilson Dep. at 75; see also id. at 80-82; Compl. Add. at 1-2.  Wilson says he did not punch any of the officers during the altercation.  Wilson Dep. at 82.

All of the officers reported later that Wilson started the incident by throwing a punch towards C.O. Calderon, at which point C.O. Calderon used force to restrain Wilson, with the assistance of C.O.s Kinloch, Moore, and Elliot.  Use of Force Report at D4-D8, D10-D24.[4]

---

[4]  We cite to officers' versions of the altercation only to set forth their contentions for context, not as an indication that their contentions are supported by admissible evidence.  In fact, the defendants' motion for summary judgment included no sworn testimony by any of the defendants, with the exception of C.O. Calderon's 2012 affidavit corroborating the criminal charges filed against Wilson.  See Supporting Deposition of C.O. Fernando Calderon, dated June 1, 2012 (attached as Ex. K to Ryan Decl.) ("Calderon Dep."), at DEF 742-44.  While defendants cite the Use of Force Reports frequently in their brief, these reports are unsworn and hearsay, and no foundation has been laid for their admission.  See Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

Wilson denies that he did anything to provoke the incident. See Wilson Dep. at 74-75 ("Calderon threw the first punch. I did not resist."); Wilson Decl. I at E4 ("[T]his incident had commenced from [Captain France] telling me and reiterating "I GIVE YOU THE GREEN LIGHT" . . . and she (France) nodded to Calderon who then threw the 1st/initial punch . . . ."); Pl Letter II at E18 ("[N]o reasons for defendants to overreact with violence, as they had used objectively unreasonable force against myself, unprovoked and not resisting . . . .") (capitalization and internal quotation marks omitted).

As he was being hit by the officers, Wilson dropped to his knees, clasping his hands behind his head with his elbows tucked in to protect his head and face, and lay face down on his stomach with his legs straight out. Compl. Add. at 2; Wilson Dep. at 86; Wilson Decl. I at E4; Wilson Decl. II at F6. He was then handcuffed. Compl. Add. at 2; Wilson Dep. at 91-92. Once he was handcuffed, the officers started kicking Wilson while he was on the ground, which included a kick to Wilson's right eye. Compl. Add. at 2; Wilson Dep. at 81, 87, 91. C.O. Calderon punched him two more times, once to the right kidney side, and once to the back of the head. Wilson Dep. at 80. Wilson could not recall how many times C.O.s Kinloch, Elliot, or Moore kicked and punched him, as Kinloch and Moore were part of the "wolf pack of officers," and "at the time there were so many surrounding [Wilson that he] couldn't see who was hitting [him] from where." Wilson Dep. at 82; Wilson Decl. I at E3. Wilson did not recall if Captain Bramwell was present or personally involved. Id. at 81-82. A few minutes after Wilson was handcuffed, a "probe team" of officers arrived to escort Wilson to intake, "with no shoes on." Wilson Dep. at 92-93; Compl. Add. at 2. Captain France told the probe team "he swung on me!" Wilson Decl. I at E3, E5.

Wilson was seen at GMDC's medical clinic by Dr. Joon Park. Injury to Inmate Report,

dated Feb. 27, 2012 (attached as Ex. F to Ryan Decl.) ("Injury to Inmate Report"); see also

Compl. Add. at 2. Dr. Park observed a "superficial cut on lower orbit" of Wilson's eye, a

"superficial skin injury" to both knees, and that Wilson reported pain in his ribs. Injury to

Inmate Report. Wilson received follow-up treatment on March 7, 2012, where he complained of

left rib pain and was prescribed ibuprofen. Medical Records, dated Mar. 7, 2012 (attached as

Ex. E to Ryan Decl.) ("Medical Records"), at D586-87. X-rays showed that Wilson's ribs were

not fractured. Id. at D588, D645. Wilson stated that he had persistent pain in his "lower left

side, which is located where [he was] kicked in the ribs at," which made it painful to lay on his

left side for at least three months. Wilson Dep. at 105; Compl. Add. at 2, 4.

       2. Disciplinary Hearing

Wilson was cited by prison officials for the February 27 incident for assaulting and

fighting, disrespect for staff, and refusal to obey a direct order. Report and Notice of Infraction,

dated Feb. 27, 2012 (attached as Ex. G to Ryan Decl.) ("Infraction Ticket"); Wilson Dep. at 107.

A "Report and Notice of Infraction" — the document that apparently started the disciplinary

process — indicates that Wilson "refused to sign" on March 1, 2012, at 2:00 p.m. See Infraction

Ticket. Wilson states that he never received the ticket, or any of the corrections officers' reports,

until after a disciplinary hearing was held, and that the "refused to sign" notation on the ticket

was there before he saw the charge. See, e.g., Wilson Decl. I at E1 ("I [was] NEVER SERVED

A TICKET (Infraction) prior to my initial date to serve [punitive segregation time] . . . .");

Wilson Decl. II at F7 ("[T]hey would submit paperwork as reports which were NEVER ONCE

SHOWN NOR PRESENTED TO MYSELF, such as D158, [and this] is why this sheet is not

filled out, stating "REFUSED TO SIGN . . . ."). Wilson also claims that Captain Bramwell

made various falsifications and forgeries on the ticket and in his investigation of the incident.

See, e.g., Pl. Responses at E11 (suggesting Captain Bramwell's report that Wilson did not wish to make a statement was false, and complaining that he was never shown any reports); Pl. 3d Responses at E19 ("Capt. Bramwell lies and tries to cover for Calderon . . . .").

A disciplinary hearing was held on March 6, 2012, but Wilson was removed from the proceedings before they began. Compl. Add. at 3; Hearing Report and Notice of Disciplinary Disposition, dated Mar. 6, 2012 (attached as Ex. H to Ryan Decl.) ("Hearing Report"), at D38; Pl. Letter II at E16. According to Wilson, the hearing officer arrived late, and when Wilson was asked to "sit down" by the officer, "[Wilson] jokingly responded that 'I have all day to sit down, I want to stand up for now.' And laughed." Compl. Add. at 3; Pl. Letter II at E16. The hearing officer responded "YOU CAN GO THIS IS OVER, I'LL CONDUCT THE HEARING WITHOUT YOU!!" Compl. Add. at 3 (internal quotation marks omitted); see also Wilson Decl. I at E5.[5] Wilson was then removed from the hearing room, and was not called back. See Pl. Letter II at E16.

Wilson was found guilty in abstentia on all infractions and sentenced to 140 days in punitive segregation (also referred to as the "bing") and a $100 restitution payment. Hearing Report at D39. Wilson said that he learned of the hearing's result (and that it had been concluded in his absence) just before he was placed in the "bing." See Pl. Decl. I at E1, E5; Pl. Responses at E10. The report, marked as "refused to sign," described the process Wilson could use to appeal the decision. See Hearing Report at D39. It required that Wilson appeal the

---

[5] The hearing officer's report says Wilson was ordered to be quiet, but instead became loud and disrespectful, even when warned that the hearing "would proceed without him [if] he continued." Hearing Report at D38. The report contains no further detail about Wilson's behavior. The Hearing Report, however, is unsworn and thus statements contained within it cannot be considered for their truth.

decision "within two (2) days of service."  Id.

### 3.  Grievance and Appeal

Wilson filed two documents complaining about the hearing.  One was a document

labeled "Grievant's Statement Form," which is dated March 17, 2012, and is marked as received

by the "Grievance Office" on what appears to be March 21, 2012.  See Ex. P to Ryan Decl.

("March 17 Grievance"), at D154.  The other document, dated April 10, 2012, is on a form

labeled "Notice of Appeal of Disciplinary Disposition."  See Ex. Q to Ryan Decl. ("April 10

Appeal"), at D157.  This document is marked as received by the "Grievance Office" on April 16,

2012.  Id.  Both documents in the record are accompanied by a memorandum from the Inmate

Grievance Resolution Committee ("IGRC") to Wilson, which was apparently used to return the

grievances to Wilson.  See March 17 Grievance at D153; April 10 Appeal at D156.  Both

memoranda state that Wilson's "complaint" was determined to be "non-grievable" and thus "not

falling within the jurisdiction of the [IGRC]."  March 17 Grievance at D153; April 10 Appeal at

D156.  Each states that the reason the complaint is non-grievable is "there is already an existing

appeal mechanism within the Department of Correction."  March 17 Grievance at D153; April

10 Appeal at D156.

As described further below, Wilson asserts that the prison did not properly make an

appeal of the disciplinary hearing available to him.[6]

---

[6]  Separately, on March 7, 2012, Wilson filed a grievance against the C.O.s who allegedly
assaulted him on February 27, 2012.  See Grievant's Statement Form, dated Mar. 7, 2012 (Pl.
Letter at Ex. E2).  The IGRC returned the complaint as non-grievable, indicating "that the matter
pertains an alleged assault/ harassment" [sic] and "that the action requested is to censor,
discipline, or remove a staff person from an assignment that is beyond the purview of the IGRC
as per CORC Disposition #1421/82."  Non-Grievable Complaint, dated Mar. 12, 2012 (Pl. Letter
at Ex. E1).  Defendants argue that this latter document should not be considered because Wilson
failed to produce it.  See Defs. Reply at 7.  Because its consideration does not affect the

4. <u>Arrest and Plea</u>

Wilson was arrested in connection with the February 27 incident on April 26, 2012.  The

charges were Obstruction of Governmental Administration in the Second Degree (N.Y. Penal

Law § 195.05), Assault with Intent to Cause Physical Injury (N.Y. Penal Law § 120.00), and

Harassment in the Second Degree (N.Y. Penal Law § 240.26).  Defs. 56.1 ¶ 35; Arrest Report,

dated Apr. 26, 2012 (attached as Ex. J to Ryan Decl.).  The substantive portion of the criminal

complaint, sworn by C.O. Calderon, stated that on February 27, 2012, at 6:00 p.m., at 1515

Hazen Street, Bronx, New York,

> [Wilson] was being escorted through the hallways of [Riker's Island] and did not
> clear the magnetometer. . . .  [C.O. Calderon] directed [Wilson] to go back
> through the magnetometer and . . . [Wilson] failed to clear the magnetometer a
> second time. . . .  [C.O. Calderon] directed [Wilson] to put his hands on the wall
> so that he could conduct a pat-frisk to ensure [Wilson] did not have any
> contraband on his person and [Wilson] stated, in sum and substance, THAT
> WASN'T ME RINGING, I DON'T HAVE NOTHING.  WHY DO YOU WANT
> ME TO GO TO THE WALL? . . .  [W]hen [C.O. Calderon] began to pat-frisk
> [Wilson, he] stated, in sum and substance, WHAT THE FUCK ARE YOU
> DOING?  DON'T FUCKING TOUCH ME. . . .

> [Wilson] then swung at [C.O. Calderon] with a closed fist, but missed and grazed
> the right side of [C.O. Calderon's] face. . . .  [Wilson's] aforementioned conduct
> prevented [C.O. Calderon] from performing his official duty as a Correction
> Officer in that [C.O.] Calderon was responsible for maintaining the safety and
> security of the corridor in the above correction facility when this incident took
> place, and [Wilson's] actions prevented [C.O. Calderon] from completing his
> official duties. . . .

> [Wilson's] above conduct caused [C.O. Calderon] to experience fear for his
> physical safety as well as annoyance and alarm.

Calderon Dep. at DEF 743-44.

On June 11, 2012, Wilson pled guilty to the violation of Harassment in the Second

disposition of defendants' motion, we need not decide that question now.

Degree (N.Y. Penal Law § 240.26), and was sentenced to 15 days in jail.  Transcript of Hearing

in Supreme Court, Bronx County, Docket # 25590C/2012, dated June 11, 2012 (attached as Ex.

M to Ryan Decl.) ("Plea Tr."), at DEF 752-56; Certificate of Disposition -

Misdemeanor/Violation, dated May 19, 2016 (attached as Ex. L to Ryan Decl.) ("Certificate of

Disposition").

### 5.  The Instant Case

Wilson filed his Complaint in this case on August 6, 2014.  See Compl.  Construed

liberally, Wilson's complaint alleges (1) a violation of his Fifth and Fourteenth Amendment Due

Process rights to be free of excessive use of force based on the alleged assault against him by the

C.O.s; (2) a violation of his Fifth and Fourteenth Amendment Due Process rights to be free from

restrictive confinement conditions without cause based on his removal from his disciplinary

hearing; (3) a violation of his Fourth and Fourteenth Amendment rights against unreasonable

"seizure," under the theories of malicious prosecution and false arrest, based on the pursuit of the

state court charges; (4) a violation of his First Amendment rights because he was "not allowed to

make nor write any statements linked to the D.O.C.'s INCIDENT REPORTS"; (5) conspiracy to

deprive him of his civil rights; and (6) "defamation."  Compl. at 8-10; Compl. Add. at 2- 4.

## II.  LAW GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states that summary judgment is

appropriate when "the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex

Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)); Beard v. Banks, 548

U.S. 521, 522 (2006) (same).  A genuine issue of material fact exists "if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact exists, "[t]he evidence of the non-movant is to be believed," and the court must draw "all justifiable inferences" in favor of the non-moving party. Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial,'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis and additional citation omitted), and "may not rely on conclusory allegations or unsubstantiated speculation," Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (citation omitted). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." Anderson, 477 U.S. at 256. Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to 'make a showing sufficient to establish the existence of an element essential to [its] case.'" Nebraska v. Wyoming, 507 U.S. 584, 590 (1993) (quoting Celotex, 477 U.S. at 322) (alteration in original). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." Allen v. Cuomo, 100 F.3d 253, 258 (2d Cir. 1996) (citing Anderson, 477 U.S. at 247-48).

As Wilson appears pro se, we construe his papers "liberally and interpret them to raise the strongest arguments that they suggest." E.g., Pabon v. Wright, 459 F.3d 241, 248 (2d Cir. 2006) (citation and internal quotation marks omitted). Nonetheless, "our application of this different standard does not relieve plaintiff of his duty to meet the requirements necessary to

defeat a motion for summary judgment." Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50 (2d Cir. 2003) (citation and internal quotation marks omitted); accord Bennett v. James, 737 F. Supp. 2d 219, 226 (S.D.N.Y. 2010) ("Notwithstanding the deference to which a pro se litigant is entitled, as well as the deference accorded to a non-movant on a summary judgment motion," the nonmovant "must produce specific facts to rebut the movant's showing and to establish that there are material issues of fact requiring a trial.") (citations, alteration, and internal quotation marks omitted), aff'd, 441 F. App'x 816 (2d Cir. 2011).

III.  DISCUSSION

To establish a claim under 42 U.S.C. § 1983, a plaintiff must show that there has been a denial of a right, privilege, or immunity secured by the Constitution or laws of the United States and that the deprivation of such right occurred under color of state law.  See 42 U.S.C. § 1983; West v. Atkins, 487 U.S. 42, 48 (1988).  Section 1983 does not in and of itself create any substantive rights; rather, a plaintiff bringing a § 1983 claim must demonstrate a violation of an independent federal constitutional or statutory right.  See Chapman v. Hous. Welfare Rights Org., 441 U.S. 600, 617-18 (1979).

For both sentenced prisoners and pretrial detainees, the Prison Litigation Reform Act ("PLRA") places an additional restriction on § 1983 claims: a prisoner must exhaust all available administrative remedies before filing his or her complaint in federal court.  See 42 U.S.C. § 1997e; Ross v. Blake, 136 S. Ct. 1850, 1856 (2016) ("An inmate shall bring no action . . . absent exhaustion of available administrative remedies.") (citations and internal quotation marks omitted); see also United States v. Khan, 540 F. Supp. 2d 344, 349 (E.D.N.Y. 2007) (exhaustion requirements of PLRA apply to both pre- and post-trial detainees).

A.  Use of Excessive Force

Wilson claims that C.O.s Calderon, Elliot, Kinloch, Moore, and John Doe, and Captains France and Bramwell, violated his Fourteenth Amendment Due Process right by using excessive force.[7]  Wilson states that C.O. Calderon punched him in the back of the head, without provocation, while he was against a wall.  Wilson Dep. at 74-75.  He says that the "other officers" then "join[ed] in" punching him, "swinging wildly at [him]," although "[m]ost of their punches . . . were hitting each other because there were so many of them, [and] they were close range."  Id. at 75.  He alleges that C.O. Calderon hit him "three times," twice in the head and once at "the right kidney side."  Id. at 80.  He does not recall how many times C.O.s Kinloch and Moore punched him, id. at 80-82, but says that Captain France kicked him three times on his right side, id. at 81.  He does not recall if Captain Bramwell was present "because there were so many officers surrounding [him]."  Id.  He says he

> cannot say how many times Officer Moore, if he had hit me or kicked me, because he was in the wolf pack of officers, so he might have been the one that hit me five times.  I don't even know because at the time there were so many surrounding me I couldn't see who was hitting me from where.  It's just all of them.

Id. at 82.  He also said that an officer kicked him under his right eye, though he does not know the officer's name.  Id. at 91-92.  Wilson claims that he suffered an abrasion under his right eye as well as back pain and rib pain as a result of this use of force.  Id. at 91, 105; see also Wilson Decl I at E5 ("I had suffered physical injuries . . . a busted lip, besides the other injuries, knees,

---

[7]  Although Wilson's complaint suggests that defendants violated his rights under the Fifth Amendment, his claims properly sound under the Fourteenth Amendment, as he was in state custody during the entire incident.  See, e.g., Caiozzo v. Koreman, 581 F.3d 63, 69 (2d Cir. 2009) ("[A] person detained prior to conviction receives protection against mistreatment at the hands of prison officials under the [Fifth Amendment] if the pretrial detainee is held in federal custody, or the [Fourteenth Amendment] if held in state custody.").

elbows, ribs, eye."); id. at E8 (contused ribs).

"[T]he right of pretrial detainees to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment." United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999) (citing Bell v. Wolfish, 441 U.S. 520, 535 (1979)). At one time, a pretrial detainee asserting an excessive force claim had to satisfy a subjective and objective element similar to what is required to prove an Eighth Amendment claim. Id. at 47-48. Specifically, a plaintiff had to show that the alleged wrongdoing was "objectively sufficiently serious or harmful enough" to cause a constitutional violation, "contrary to contemporary standards of decency and repugnant to the conscience of mankind," id. at 50 (citations and internal quotation marks omitted), and that the alleged wrongdoer subjectively "had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct," Sims v. Artuz, 230 F.3d 14, 21 (2d Cir. 2000) (citations and internal quotation marks omitted).

In Kingsley v. Hendrickson, 135 S. Ct. 2466 (2015), however, the Supreme Court held that when force is "purposefully or knowingly" used against a pretrial detainee, the detainee must show only that the force "was objectively unreasonable." Id. at 2473. Kinglsey thus altered the test previously used in the Second Circuit for claims arising under the Fourteenth Amendment. See Ross v. Corr. Officers John and Jane Does 1-5, 610 F. App'x 75, 76 n.1 (2d Cir. 2015) (summary order); Vargas v. City of New York, 2017 WL 1214434, at *12 (E.D.N.Y. Mar. 31, 2017); Carmona v. City of New York, 2016 WL 4401179, at *2 (S.D.N.Y. Mar. 1, 2016); see also Darnell v. Pineiro, 849 F.3d 17, 35 (2d Cir. 2017) (recognzing that Kingsley has overruled Second Circuit law in the Fourteenth Amendment "deliberate indifference" context).

Kingsley held that

objective reasonableness turns on the facts and circumstances of each particular case.  A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight.  A court must also account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security.

Kingsley, 135 S. Ct. at 2473 (citations, alterations, and internal quotation marks omitted)

(quoting Graham v. Connor, 490 U.S. 386, 396 (1989); and Bell, 441 U.S. at 540, 547).  Factors

to consider in judging the objective reasonableness of a use of force include:

the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

Id.; accord Perez v. Ponte, 2017 WL 1047258, at *18 (E.D.N.Y. Feb. 14, 2017); Carmona, 2016

WL 4401179, at *2.

Defendants do not contest that Wilson's version of the altercation, if accepted as true,

would permit a jury to find that he had been the subject of excessive force.  Instead, they argue

that they should prevail because Wilson's version of events is incredible, their use of force was

reasonable because it was provoked by Wilson, and they are entitled to qualified immunity.

Defs. Mem. at 11, 15, 32.  Importantly, defendants have offered no admissible evidence as to

what occurred during the altercation, other than the sworn criminal complaint filed against

Wilson, which does not address the question of what force defendants used on Wilson.

Defendants correctly note that, in opposing a motion for summary judgment, the non-

moving party "must show that there is admissible evidence sufficient to support a finding in [his]

favor on the issue that is the basis for the motion."  Defs. Mem. at 11 (alteration in original)

(internal quotation marks omitted) (quoting Fitzgerald v. Henderson, 251 F.3d 345, 361 (2d Cir.

2001)).  Ordinarily, a plaintiff "must present affidavits, based on 'personal knowledge, . . .

set[ting] forth such facts as would be admissible in evidence,' and as to which the affiant would

be competent to testify."  Fitzgerald, 251 F.3d at 361 (alteration and omission in original)

(quoting Fed. R. Civ. P. 56(e)).  Here, Wilson's sworn testimony and his medical records would

be admissible at trial.  They plainly reflect the use of excessive force.  Moreover, Wilson's

injuries — consisting of at least a cut to his head and bruising to his ribs — are consistent with

those a person could suffer after being punched in the head and kidneys and kicked in the side

and face.  Wilson's report of his injuries is largely consistent with his medical reports, which

reflect a cut to his eye and persistent rib pain.  Compare Wilson Dep. at 91, 105, and Wilson

Decl. I at E5, E8, with Injury to Inmate Report; Medical Records, at D586-87.  Thus defendants'

argument that Wilson's description of his injuries does not match his medical records, Defs.

Mem. at 12, or is otherwise inherently incredible, is rejected.

As to the objective reasonableness of the force used, although the criminal complaint

sworn by C.O. Calderon states that Wilson "swung" at C.O. Calderon and "grazed [C.O.]

Calderon on the face," Calderon Dep. at DEF 744, Wilson has denied that this occurred, see

Wilson Dep. at 82.  Thus a reasonable jury could credit Wilson's testimony and conclude that

the officers' use of force against him was not objectively reasonable and thus unjustified.

Defendants' citation to McMillan v. City of New York, 2011 WL 6129627 (S.D.N.Y. Dec. 9,

2011), is of no assistance because in that case the plaintiffs had pled guilty to resisting arrest,

thereby providing a justification for the use of some force against them.  See id. at *7.  Here,

Wilson only pled guilty to Harassment in the Second Degree.[8]  Notably, Wilson's plea allocution contains no indication as to what specific conduct he was admitting to.  See Plea Tr. at DEF 752-55.  The portion of the statute he pled to includes, as minimal required conduct, merely threatening to subject a person to physical contact.  See N.Y. Penal Law § 240.26(3).  Thus, Wilson's plea is consistent with his story that he did not actually swing at or punch C.O. Calderon.  Therefore, the fact that Wilson pled guilty to "harassment" would not require a reasonable jury to find that whatever harassment Wilson engaged in justified the officers' response, let alone with the degree of force that Wilson claims was used against him.

Finally, we reject defendants' argument that C.O.s Calderon and Kinloch's medical records from the date of the incident would require a jury to find that Wilson punched the officers or otherwise intentionally inflicted injuries on them.  See Defs. Mem. at 14-15 (citing Excerpts from Medical Records of Fernando Calderon (attached as Ex. N to Ryan Decl.) ("Calderon Medical Records"); and Excerpts from Medical Records of Christophe Kinloch (attached as Ex. O to Ryan Decl.) ("Kinloch Medical Records")).  C.O. Kinloch's medical records show that he complained of pain to his left knee and ankle.  Kinloch Medical Records at D706-08.  C.O. Calderon's medical records show he complained of pain in his knee, shoulders, and hands.  Calderon Medical Records at D723-24.  The medical records are based almost entirely on the officers' subjective reports of pain, with the exception of a notation that C.O. Calderon experienced swelling in the fourth finger of his right hand.  See Calderon Medical Records at D729-30.  A reasonable jury could find either that the officers did not accurately report their subjective injuries or that those injuries, including C.O. Calderon's swollen finger,

---

[8]  The defendants' brief incorrectly states that plaintiff pled guilty to "attempted assault." Defs. Mem. at 15.

were consistent with Wilson's story that the officers used significant force to injure and subdue

him without provocation. Indeed, the only admissible evidence in the record regarding the

defendants' view of what precipitated the incident does not establish that Wilson caused any

injuries to the C.O.s' knees, shoulders, ankles, or fingers. Rather, it shows only that Wilson's

fist "grazed" the right side of C.O. Calderon's face. See Calderon Dep. at DEF 744. The

medical records do nothing to show that Wilson caused them the injury that purportedly justified

their use of force.

We agree with defendants, however, that any excessive use of force claims against

Captain Bramwell must be dismissed. See Defs. Mem. at 17. To hold a defendant liable under

§ 1983, a plaintiff must establish that the defendant was personally involved in the alleged

constitutional violation. Grullon v. City of New Haven, 720 F.3d 133, 138-39 (2d Cir. 2013)

(collecting cases). For supervisors, personal involvement may not be established through the

doctrine of respondeat superior. See Hernandez v. Keane, 341 F.3d 137, 144-45 (2d Cir. 2003);

accord Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 127 (2d Cir. 2004)

("An individual cannot be held liable for damages under § 1983 'merely because he held a high

position of authority,' but can be held liable if he was personally involved in the alleged

deprivation.") (quoting Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996)). Wilson has marshaled

no evidence showing that Captain Bramwell was involved in the use of force against him. See

Wilson Dep. at 81-82 ("I do not recall that [Bramwell] was personally involved."). Instead, he

claims that Captain Bramwell conducted a deficient (or falsified) investigation into the incident

after it occurred. See Pl. 3d Responses at E22-23 (accusing Bramwell of intentionally altering

and falsifying reports). Accordingly, any excessive use of force claim against Captain Bramwell

must be dismissed.[9]

B.  Qualified Immunity

These same disputed facts also make summary judgment on the issue of qualified

immunity inappropriate.  As was stated by the Second Circuit in Munafo v. Metropolitan

Transportation Authority, 285 F.3d 201 (2d Cir. 2002):

> A government official sued in his individual capacity is entitled to qualified
> immunity (1) if the conduct attributed to him was not prohibited by federal law,
> see, e.g., County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5, 118 S. Ct. 1708,
> 140 L. Ed. 2d 1043 (1998); Siegert v. Gilley, 500 U.S. 226, 232, 111 S. Ct. 1789,
> 114 L. Ed. 2d 277 (1991); or (2) where that conduct was so prohibited, if the
> plaintiff's right not to be subjected to such conduct by the defendant was not
> clearly established at the time it occurred, see, e.g., Harlow v. Fitzgerald, 457
> U.S. 800, 817-19, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982); or (3) if the
> defendant's action was "objective[ly] legal[ly] reasonable[ ] . . . in light of the
> legal rules that were clearly established at the time it was taken."  Anderson v.
> Creighton, 483 U.S. 635, 639, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987) (internal
> quotation marks omitted); see Harlow v. Fitzgerald, 457 U.S. at 819, 102 S. Ct.
> 2727.

Munafo, 285 F.3d at 210 (alterations and omission in original); accord Alali v. DeBara, 2008

WL 4700431, at *5 (S.D.N.Y. Oct. 24, 2008).  However, in the excessive force context,

> [s]ummary judgment should not be granted on the basis of a qualified immunity
> defense premised on an assertion of objective reasonableness unless the defendant
> "show[s] that no reasonable jury, viewing the evidence in the light most favorable
> to the Plaintiff, could conclude that the defendant's actions were objectively
> unreasonable in light of clearly established law."

O'Bert ex rel. Estate of O'Bert v. Vargo, 331 F.3d 29, 37 (2d Cir. 2003) (second alteration in

---

[9]  Claims against any defendants now named as "John Doe" or "Jane Doe" must also be
dismissed.  After the Court found that the complaint "does not appear to supply sufficient
information to permit the New York City Law Department to identify the Doe Defendants,"
Order or Service, filed Sept. 16, 2014 (Docket # 7), Wilson was informed that it was his
responsibility to provide further identifying information and to move to amend the complaint to
add any new defendants.  See Order, filed Feb. 1, 2016 (Docket # 89), at 1-2 & n.1.  Wilson
never so moved.

original) (quoting <u>Ford v. Moore</u>, 237 F.3d 156, 162 (2d Cir. 2001)) (additional citations omitted); <u>accord</u> <u>O'Brien v. Barrows</u>, 556 F. App'x 2, 4 (2d Cir. 2014) (summary order); <u>Watts v. N.Y.C. Police Dep't</u>, 100 F. Supp. 3d 314, 325 (S.D.N.Y. 2015).  It is not necessary to reach the issue of whether the officers' conduct here should be evaluated under the pre-<u>Kingsley</u> standard for qualified immunity purposes.  Because disputed issues of material fact exist regarding the objective reasonableness of the officers' use of force, and because the same disputed issues of fact exist on the question of whether the officers' actions subjectively demonstrated the necessary level of culpability, the officers cannot be granted summary judgment on their qualified immunity defense.

### C.  Due Process and Punitive Segregation

Wilson claims that his sentence of 140 consecutive days in punitive segregation deprived him of his liberty without the due process of law.  <u>See</u> Compl. at 9; Compl. Add. at 2-3. Defendants argue that this claim must be dismissed because it is unexhausted, Defs. Mem. at 20-24, and because he has not made out the elements of the claim, <u>id.</u> at 18-20.  We address each issue next.

#### 1.  Exhaustion

The PLRA requires "[c]omplete exhaustion of . . . administrative remedies through the highest level for each claim" asserted by a prisoner or detainee.  <u>Veloz v. New York</u>, 339 F. Supp. 2d 505, 514 (S.D.N.Y. 2004), <u>aff'd</u>, 178 F. App'x 39 (2d Cir. 2006); <u>see</u> <u>also</u> <u>Porter v. Nussle</u>, 534 U.S. 516, 524 (2002) ("All available remedies must now be exhausted; those remedies need not meet federal standards, nor must they be plain, speedy, and effective.") (internal quotation marks omitted).  This exhaustion must also be "proper" — that is, "compl[y] with an agency's deadlines and other critical procedural rules because no adjudicative system

can function effectively without imposing some orderly structure on the course of its proceedings." Woodford v. Ngo, 548 U.S. 81, 90-91 (2006); accord Riles v. Buchanan, 656 F. App'x 577, 579 (2d Cir. 2016) (summary order). If a plaintiff fails to timely comply with the exhaustion requirement as to a claim, that claim must be dismissed. See, e.g., Williams v. Comstock, 425 F.3d 175, 176 (2d Cir. 2005) (per curiam) (failure to timely file grievance amounted to failure to exhaust administrative remedies); Angulo v. Nassau County, 89 F. Supp. 3d 541, 551 (E.D.N.Y. 2015) (plaintiff failed to properly exhaust his administrative remedies by failing to timely file his grievance according to prison procedures or appeal).

Exhaustion may be excused under the PLRA where an administrative remedy is not "available." See Ross v. Blake, 136 S. Ct. at 1858. The Supreme Court has noted three circumstances where a remedy is rendered unavailable. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738 (2001)). Second, if a procedure is "so opaque that it becomes, practically speaking, incapable of use," to the point that "no ordinary prisoner can discern or navigate it," it is unavailable. Id. Finally, "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation," the remedy is effectively unavailable and failure to exhaust may be excused. Id. at 1860 (citing Woodford, 548 U.S. at 102).

Importantly, exhaustion of administrative remedies is an "affirmative defense." Jones v. Bock, 549 U.S. 199, 216 (2007); accord Williams v. Corr. Officer Priatno, 829 F.3d 118, 122 (2d Cir. 2016). Thus, defendants bear the burden of proving that Wilson did not comply with the exhaustion requirement.

Here, defendants have not offered any evidence from someone with personal knowledge as to precisely what records they possess with respect to Wilson's efforts to exhaust his claim. As Wilson correctly observes, see Wilson Decl. I at E8, the only sworn testimony presented to this Court on the exhaustion issue comes from defendants' attorney, who attests to the authenticity of the documents she submits, see generally Ryan Decl. Defendants' attorney has placed in the record what the attorney asserts to be "true and correct" copies of the March 17 Grievance and the April 10 Appeal. Defendants provide no admissible evidence, however, showing that these are the only records in their possession reflecting any effort by Wilson to exhaust his claim. While defendants argue that plaintiff "has put forth no evidence" that he "exhaust[ed] all administrative remedies," Defs. Mem. at 22, in fact it is defendants that have the burden of making this showing, not plaintiff, see, e.g., Hubbs v. Suffolk Cnty Sheriff's Dept., 788 F.3d 54, 61 (2d Cir. 2015) ("The burden, we repeat, is on the defendant to establish at the outset that an administrative remedy was 'available' in the sense that a grievance policy or procedure existed and covered the dispute at hand."); Gantt v. Horn, 2013 WL 865844, at *6 (S.D.N.Y. Mar. 8, 2013) ("[I]t is the defendant's burden to prove that the plaintiff failed to meet the exhaustion requirements.").

Putting this point aside, defendants never explain in their memorandum of law precisely what steps Wilson should have taken to exhaust his claim or why what he did was not sufficient. Defendants place in the record the rules governing the Inmate Grievance Resolution Program, see N.Y.C. Dep't of Corr. Directive 3375R-A, effective Mar. 13, 2008 (attached as Ex. R to Ryan Decl.), but these rules specifically state that disciplinary decisions are "non-grievable," id. § II.C. If, perhaps, we are meant to discern that Wilson should have followed the "appeals process" described in the notations marked on Wilson's grievances, defendants' briefs never say

23

as much. Notably, the disciplinary notice provided to Wilson gives no explanation of how to "appeal" the decision. It states only that "[y]ou have the right to appeal an adverse decision rendered by the Adjudication Captain within two (2) days of service of this decision." Hearing Report at D39. While case law refers to a certain directive and form that governs this process, see, e.g., Best v. Newton, 2016 WL 5416505, at *2 (S.D.N.Y. Sept. 28, 2016), the defendants in this case have put nothing in the record on this question. They never say exactly what Wilson should have done following the hearing — at a time when he had been sentenced to placement in a restrictive housing unit. We also find it strange that Wilson ultimately filed an appeal on what appears to be the correct form, compare Best, 2016 WL 5416505, at *2 (referring to "Form 6500H" as the correct form for an appeal), with April 10 Appeal (written on a document labeled "Form 6500H"), but was told not that the appeal was untimely. Instead, he was told that there was some other unidentified "existing appeal mechanism" that he had to follow, see April 10 Appeal at D156 ("[T]here is already an existing appeal mechanism within the Department of Correction.").

For his part, Wilson acknowledges that he saw the "ticket" showing that he received a $100 restitution charge and 140 days in punitive segregation on the day he was placed in the "bing." See Compl. Add. at 3; see also Hearing Report at D39. But he states that he did not receive adequate assistance from the grievance process's supervisor, Patricia Mimms. See Wilson Dep. at 106-07; Pl. 3d Responses at E23 ("[T]he grievance lady, Patricia Mimms, had[] never sent an APPEALS FORM NOR PROPER appeal form to appeal each grievance . . . as she never had submitted this extra paperwork . . . ."). He asserts that Miss Mimms told him what information to include in the grievance forms and how to file them, but "never once had ever told [him] the alternative methods and instruments as a complaint mechanism to file and how to

proceed against [the hearing decision] . . . ."  Pl. Responses at E11 (capitalization omitted); see also Pl. Letter II at E16 ("[M]y alternatives were never revealed nor discussed by the grievance lady, Mimms . . . .").  His submissions also state that Miss Mimms did not submit all of his grievance paperwork, see Pl. 3d Responses at E23, and suggests that he was never given the proper forms, see Wilson Decl. II at F7 ("as this were a 'mechanism to appeal non-grievable complaints,' why weren't this ever given to myself previously?").

Given that defendants bear the burden of demonstrating that Wilson failed to exhaust his available administrative remedies, the absence of any information in the record as to what Wilson was supposed to do to challenge the hearing, and Wilson's claim that the person apparently in charge of processing grievances from him while he was in punitive segregation did not give him the proper form, defendants cannot obtain summary judgment on the question of whether an appeal was "available" to Wilson following the disciplinary hearing — either because the process was "so opaque that it becomes, practically speaking, incapable of use" or because Wilson was "thwart[ed]" in his efforts to take advantage of it by "machination" or "misrepresentation."  See Ross v. Blake, 136 S. Ct. at 1859-60.

Accordingly, summary judgment should not be granted on Wilson's due process claim on the grounds that it is unexhausted.[10]

2.  Merits

"[P]rocedural due process requires that pretrial detainees can only be subjected to segregation or other heightened restraints if a pre-deprivation hearing is held to determine

---

[10]  We note that where there is a factual dispute as to whether the exhaustion defense has been proven, the dispute is resolved by a hearing before the district judge, not by a jury.  See Messa v. Goord, 652 F.3d 305, 309 (2d Cir. 2011) (per curiam).

whether any rule has been violated." Johnston v. Maha, 606 F.3d 39, 41 (2d Cir. 2010).[11]  As to

the nature of the process due at such a hearing, the Second Circuit has stated:

> "Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." Wolff v. McDonnell, 418 U.S. 539, 556, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974). However, "[c]ertain due process protections" must be observed before an inmate may be subject to confinement in the SHU [special housing unit]. Luna v. Pico, 356 F.3d 481, 487 (2d Cir. 2004) (citing Wolff).  These protections include "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." Id.  We have interpreted Wolff to recognize a right to "appear at the hearing." Young v. Hoffman, 970 F.2d 1154, 1156 (2d Cir. 1992) (citing Freeman v. Rideout, 808 F.2d 949, 953 (2d Cir. 1986)); see also Willey v. Kirkpatrick, No. 13-699, 801 F.3d 51, 63, 2015 WL 5059377, at *10 (2d Cir. Aug. 28, 2015) ("Our reading of Wolff does not comport with the conclusion that the Constitution permits wholesale exclusion of an inmate from a disciplinary hearing.").  "[R]egardless of state procedural guarantees, the only process due an inmate is that minimal process guaranteed by the Constitution, as outlined in Wolff." Shakur v. Selsky, 391 F.3d 106, 119 (2d Cir. 2004) (internal citations and quotation marks removed).

Smith v. Fischer, 803 F.3d 124, 127 (2d Cir. 2015) (per curiam) (first and third alteration in

original).  Placement in "punitive segregation" at Rikers Island has been found to invoke the due

process protections of Wolff.  See, e.g., Best, 14 F. Supp. 3d at 347-49.

A detainee's right to appear at a hearing is not absolute, and may be limited "so long as

the reasons are logically related to preventing undue hazards to institutional safety or

correctional goals." See Ponte v. Real, 471 U.S. 491, 497 (1985) (internal quotation marks

omitted).  Thus, for example, courts have found that a hearing officer's decision to remove a

---

[11]  Thus, unlike sentenced prisoners, a pretrial detainee "need not show that an imposed restraint imposes atypical and significant hardships to state deprivation of a liberty interest protected by procedural due process." Iqbal v. Hasty, 490 F.3d 143, 163 (2d Cir. 2007), rev'd on other grounds by Ashcroft v. Iqbal, 556 U.S. 662 (2009); accord Johnston v. Maha, 460 F. App'x 11, 14 (2d Cir. 2012) (summary order); Best v. N.Y.C. Dep't of Corr., 14 F. Supp. 3d 341, 347 (S.D.N.Y. 2014).

prisoner or detainee from a disciplinary hearing after he made threats of violence or acted in an excessively disruptive manner was justified.  See, e.g., Randle v. Woods, 299 F. App'x 466, 469 (5th Cir. 2008) (per curiam) (due process claim for exclusion from a disciplinary hearing meritless because petitioner was excluded "because of his disruptive behavior"); Sylvester v. Dir., TDCJ-CID, 2009 WL 973090, at *5 (E.D. Tex. Apr. 9, 2009) (petitioner's removal from disciplinary hearing for failure to state his name or otherwise cooperate with proceedings did not violate due process); Payne v. Axelrod, 871 F. Supp. 1551, 1557-58 (N.D.N.Y. 1995) (removal of inmate from disciplinary hearing who made threats of violence was justified).  Nevertheless, this exclusion "must occur only in the unusual circumstance."  Brooks v. Prack, 77 F. Supp. 3d 301, 319 (W.D.N.Y. 2014) (internal quotation marks omitted) (quoting Malik v. Tanner, 697 F. Supp. 1294, 1302 n.12 (S.D.N.Y. 1988)).  Additionally, the hearing officer has the burden of justifying the detainee's removal by showing it was rational.  See Kingsley v. Bureau of Prisons, 937 F.2d 26, 30-31 (2d Cir. 1991) (citing Ponte, 471 U.S. at 499).

On the issue of whether Wilson received notice, defendants have submitted a copy of the "ticket" Wilson was purportedly given advising him of the disciplinary charges against him.  See Infraction Ticket.  The ticket is dated March 1, 2012 — five days before Wilson's hearing.  Id.  It indicates that it was served by Captain Bramwell, and that Wilson "refused to sign."  Id.  Defendants seem to believe that this document shows that Wilson was served with the ticket and that Wilson refused to sign it.  See Defs. Mem. at 19-20.  But defendants offer no sworn statements based on personal knowledge and thus there is no competent evidence in the record on these issues.  Wilson states that he never received notice of the hearing.  Wilson Dep. at 107-08; Pl. Responses at E9-E10; Pl. 3d Responses at E23.  There is thus an issue of fact as to whether Wilson received proper notice.  To the extent defendants are arguing that any failure to

give notice is irrelevant because Wilson was produced for the hearing, <u>see</u> Defs. Reply at 12, such an argument is meritless as the purpose of notice is to allow Wilson the opportunity to prepare and present a defense, <u>see</u> <u>Wolff</u>, 418 U.S. at 564 ("Part of the function of notice is to give the charged party a chance to marshal the facts in his defense and to clarify what the charges are, in fact.").

On the question of whether Wilson was given a "reasonable opportunity to call witnesses and present documentary evidence," <u>Smith</u>, 803 F.3d at 127 (citations and internal quotation marks omitted), Wilson asserts that he was unjustifiably removed from the hearing. He specifically claims that, after the hearing officer arrived 15 minutes late, Wilson made a joke about "sitting down all day," was told to leave before the hearing began, and was never called back to the hearing. Pl. Letter II at E16. Defendants do not explain how they could be found to have acted properly in removing Wilson from the hearing if Wilson's version of what occurred at the hearing is true — that is, if he merely made an impertinent joke and was not otherwise disruptive. They simply assume as a factual premise that he was "given the opportunity to present a defense." Defs. Reply at 12. Of course, defendants have offered absolutely no admissible evidence to contradict Wilson's version of what occurred — either in the form of a transcript of the hearing or an affidavit from someone present.

In sum, a material issue of fact exists as to whether Wilson was denied due process when he was sentenced in absentia to 140 days in punitive segregation. Accordingly, defendants' motion for summary judgment on Wilson's due process claim should be denied.[12]

D.  <u>False Arrest and Malicious Prosecution</u>

---

[12]  We do not address any particular defendant's personal involvement, or lack thereof, in Wilson's due process claim because defendants do not raise the issue.

Wilson also references false arrest and malicious prosecution claims repeatedly in his filings.  See, e.g., Compl. at 8; Pl. 3d Responses at E23.  The Court interprets these as a claim that his arrest and prosecution on April 26, 2012, violated his Fourth and Fourteenth Amendment rights.  Plaintiff resolved the charges against him by pleading guilty to Harassment in the Second Degree (N.Y. Penal Law § 240.26), a violation, with a sentence of 15 days in jail.  Certificate of Disposition; Plea Tr. at DEF 750-54.  Wilson says he did this to "get the case over with since it were wasting my time."  Pl. 3d Responses at E19 (capitalization omitted).  Defendants argue that because the case was dismissed by plea, Wilson cannot maintain a claim of false arrest or of malicious prosecution.  Defs. Mem. at 27-29.  We address each claim separately.

1. False Arrest

"A § 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law."  Gonzalez v. City of Schenectady, 728 F.3d 149, 155 (2d Cir. 2013) (citing Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)).  "To state a claim for false arrest under New York law, a plaintiff must show that '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'"  Savino v. City of New York, 331 F.3d 63, 75 (2d Cir. 2003) (quoting Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)); accord Torres v. Jones, 26 N.Y.3d 742, 759 (2016).

"The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983."  Amore v. Novarro, 624 F.3d 522, 536 (2d Cir. 2010) (quoting Weyant, 101 F.3d at 852).  The relevant inquiry is "whether probable cause existed to arrest for any crime," not necessarily for the crimes cited by the officers or ultimately charged.  Marcavage v. City of New

York, 689 F.3d 98, 109 (2d Cir. 2012) (citing Devenpeck v. Alford, 543 U.S. 146, 153-56 (2004)); see also Zalaski v. City of Hartford, 723 F.3d 382, 385 n.2, 394-95 (2d Cir. 2013) (applying same analysis to false-arrest and retaliatory-arrest claims). A voluntary guilty plea, even for a lesser charge than that for which a plaintiff was arrested, bars a subsequent false arrest claim under § 1983 as conclusive evidence that probable cause existed. See, e.g., Horvath v. City of New York, 2015 WL 1757759, at *3 (E.D.N.Y. Apr. 17, 2015); Hope v. City of New York, 2010 WL 331678, at *2 (E.D.N.Y. Jan. 22, 2010); Smith v. P.O. Canine Dog Chas, 2004 WL 2202564, at *6 (S.D.N.Y. Sept. 28, 2004). Because Wilson pled guilty to aggravated harassment, there is conclusive evidence that probable cause existed for his arrest, and Wilson's false arrest claim is barred.

### 2. Malicious Prosecution

"To sustain a § 1983 claim of malicious prosecution, a plaintiff must demonstrate conduct by the defendant that is tortious under state law and that results in a constitutionally cognizable deprivation of liberty." Kinzer v. Jackson, 316 F.3d 139, 143 (2d Cir. 2003). To prevail on a claim of malicious prosecution under New York tort law, a plaintiff must show "(1) that the defendant commenced or continued a criminal proceeding against [the plaintiff]; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice." Id.; see also O'Brien v. Alexander, 101 F.3d 1479, 1484 (2d Cir. 1996); Torres, 26 N.Y.3d at 760.

The Supreme Court held in Heck v. Humphrey, 512 U.S. 477 (1994), that a claim for damages based on malicious prosecution is not available under § 1983 where "the conviction or sentence has [not] been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal

court's issuance of a writ of habeas corpus." Id. at 487. Accordingly, a guilty plea, even to fewer than all the charges initially brought against a § 1983 plaintiff, is not a "favorable" determination for purposes of malicious prosecution. See, e.g., Fulton v. Robinson, 289 F.3d 188, 196 (2d Cir. 2002) ("Where a prosecution did not result in an acquittal, it is generally not deemed to have ended in favor of the accused, for the purposes of a malicious prosecution claim, unless its final disposition is such as to indicate the accused's innocence."); Magnotta v. Putnam Cty. Sheriff, 2014 WL 705281, at *6 (S.D.N.Y. Feb. 24, 2014) (plaintiff's guilty plea to fewer than all of the charges against him was not a "favorable termination" such that it could support a malicious prosecution claim). Because Wilson was convicted by his plea of guilty, the case against him in state court did not terminate in his favor, and his claims based on malicious prosecution must be dismissed.

    E. Conspiracy

    Wilson's complaint charges that defendants engaged in a "conspiracy to deprive of rights and deprivation of rights," without further specification. Compl. Add. at 2. "To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999); accord Samuels v. Fischer, 168 F. Supp. 3d 625, 650 n.13 (S.D.N.Y. 2016).

    However, under the "intra-corporate conspiracy" doctrine, a plaintiff fails to state a § 1983 conspiracy claim "if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment." Herrmann v. Moore, 576 F.2d 453, 459 (2d Cir.

1978).  The same principle applies to a municipal entity, such as a county.  See, e.g., Crews v. County of Nassau, 2007 WL 4591325, at *12 (E.D.N.Y. Dec. 27, 2007).  Thus, "the officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other."  Id. (citing cases); see also Dilworth v. Goldberg, 914 F. Supp. 2d 433, 466 (S.D.N.Y. 2012) ("Because the complaint alleges that all of the alleged conspirators were either employees or otherwise agents of Westchester County acting within the scope of their employment, the conspiracy claim cannot stand because Westchester County cannot be found to have conspired with itself."); Danielak v. City of New York, 2005 WL 2347095, at *13-14 (E.D.N.Y. Sept. 26, 2005) (barring conspiracy claims because all individual defendants were employed by New York City Police Department and acted within the scope of their employment while arresting plaintiff), aff'd, 209 F. App'x 55 (2d Cir. 2006).  Here, all defendants were employed by the New York City Department of Correction at the time the incident occurred on February 27, 2012.  As a result, a conspiracy to commit an action compensable under § 1983 could not exist between them.

　　　"An exception to the intracorporate conspiracy doctrine applies to individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity."  Bond v. Bd. of Educ. of N.Y., 1999 WL 151702, at *2 (E.D.N.Y. Mar. 17, 1999); accord K.D. ex rel. Duncan v. White Plains Sch. Dist., 921 F. Supp. 2d 197, 210 (S.D.N.Y. 2013); Quinn v. Nassau Cty. Police Dep't, 5 F. Supp. 2d 347, 360 (E.D.N.Y. 1999).  No reasonable jury, however, could conclude that the defendants' use of force was in pursuit of some personal interest separate from their interest in acting as corrections officers.  Accordingly, Wilson's conspiracy claim should be dismissed.

　　　F.  First Amendment

Wilson asserts that his First Amendment rights were violated because he was "not allowed to make nor write any statements linked to the D.O.C.'s incident reports." Compl. at 9 (capitalization omitted). To the extent Wilson's claims could be construed as a claim of retaliation under the First Amendment, he must demonstrate "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004) (citation and internal quotation marks omitted). Here, there is no allegation that Wilson was punished for making protected speech. Instead the claim is that he was purportedly not allowed to contribute statements relating to the disciplinary charges. To the extent he is asserting that he was not permitted to make statements during the internal investigation of the February 27 Incident or at the disciplinary hearing, those claims would arise under the Due Process protections of the Fifth and Fourteenth Amendment, which survive to the extent stated in Section III.C.2 above. Any First Amendment claims, however, should be dismissed.

G. Defamation

Finally, at two points in his complaint, Wilson refers to "defamation" and "defamation of character." Compl. Add. at 2, 4. It is impossible to discern, however, what factual allegations Wilson is referring to. Additionally, no allegation in the complaint even arguably meets the elements of a defamation claim under New York law. See, e.g., Lombardo v. Dr. Seuss Enters., L.P., 2017 WL 1378413, at *7 (S.D.N.Y. Apr. 7, 2017) ("Under New York law, the elements of a defamation claim are (1) a defamatory statement of fact, (2) regarding the plaintiff, (3) published to a third party, (4) that is false, (5) made with the applicable level of fault, (6) causing injury, and (7) not protected by privilege.") (citation and internal quotation marks omitted).

Accordingly, any such claims must be dismissed.

IV.  CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (Docket # 128) should be granted, with the exception of Wilson's due process claim and his excessive force claim against defendants C.O.s Calderon, Elliot, Kinloch, and Moore and Captain France, for which the motion should be denied.

**PROCEDURE FOR FILING OBJECTIONS TO THIS
REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections.  See also Fed. R. Civ. P. 6(a), (b), (d).  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. George B. Daniels at 500 Pearl Street, New York, New York 10007.  Any request for an extension of time to file objections must be directed to Judge Daniels. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: July 6, 2017
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copy sent to:

Theodore O. Wilson, III
14-A-1163
Coxsackie C.F.
P.O. Box 999
Coxsackie, N.Y. 12051-0999