UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
THEODORE O. WILSON III,                           :

              Plaintiff,                          :

              -v.-                                :

C.O. FERNANDO CALDERON, et al.,                   :

              Defendants.                         :
------------------------------------------------------------------X

OPINION AND ORDER

14 Civ. 6209 (GWG)

force claim against defendant C.O.s Calderon, Elliot, Kinloch, and Moore, and Captain France.[2] See Wilson v. Calderon, 2017 WL 2881153 (S.D.N.Y. July 6, 2017), adopted by 2017 WL 3209148 (S.D.N.Y. July 27, 2017). The parties subsequently consented to disposition of this matter by a United States Magistrate Judge as provided in 28 U.S.C. § 636(c) and waived trial by jury (Docket ## 160, 162, 165).

The Court's Pro Se Intake Unit made significant efforts to find an attorney to take Wilson's case but ultimately was unable do so. Accordingly, Wilson proceeded pro se. The trial took place on September 24, 25, and 26, 2018. Wilson was the sole witness for the plaintiff. Each of the defendants was called as a witness as was Dr. Joon Park. Following the trial, the parties submitted post-trial briefs.[3]

During the trial, the Court granted the defendants' motion for judgment as a matter of law under Federal Rule of Civil Procedure 50 as to Wilson's due process claim and therefore dismissed Captain Bramwell as a defendant. (Tr. 169-170).[4] Thus, all that remains to be decided is the excessive force claim against C.O.s Calderon, Elliot, Kinloch, and Moore, and Captain France. This Opinion and Order contains the findings of facts and conclusions of law required by Federal Rule of Civil Procedure 52(a)(1) as to that claim.

---

[2] We refer to Deputy Warden France-Rene as "Captain France," and to Assistant Deputy Warden Bramwell as "Captain Bramwell" because they used those names and titles at the time of the incident.

[3] See Plaintiff's Summation Brief, filed Nov. 28, 2018 (Docket # 206) ("Pl. Br."); Defendants' Proposed Findings of Fact and Conclusions of Law, filed Dec. 7, 2018 (Docket # 207) ("Def. Br."); Defendants' Response to Plaintiff's Summation Brief, filed Jan. 4, 2019 (Docket # 209); Notice of Plaintiff's Response to Defendants' Brief, filed Jan. 7, 2019 (Docket # 210) ("Pl. Reply").

[4] The abbreviation "Tr. ___" refers to the transcript of the bench trial. See Transcript of Proceedings for Sept. 24, 25, and 26, 2018, filed Jan. 25, 2019 (Docket ## 211, 213, 215).

II. <u>GOVERNING LAW</u>

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show that there has been a denial of a right, privilege, or immunity secured by the Constitution or laws of the United States and that the deprivation of such right, privilege, or immunity occurred under color of state law. <u>See</u> 42 U.S.C. § 1983. "[T]he right of pretrial detainees to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment." <u>United States v. Walsh</u>, 194 F.3d 37, 47 (2d Cir. 1999) (citing <u>Bell v. Wolfish</u>, 441 U.S. 520, 535 (1979)). It is undisputed here that force was used against the plaintiff "purposefully or knowingly." In such a situation, the detainee must prove that the force "was objectively unreasonable." <u>Kingsley v. Hendrickson</u>, 135 S. Ct. 2466, 2473 (2015). The Supreme Court in <u>Kingsley</u> held that

> objective reasonableness turns on the facts and circumstances of each particular case. A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. A court must also account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security.

135 S. Ct. at 2473 (citations, alterations, and internal quotation marks omitted) (quoting <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989) and <u>Bell</u>, 441 U.S. at 540, 547); <u>accord</u> <u>Knight v. City of New York</u>, 2019 WL 95480, at *3 (S.D.N.Y. Jan. 2, 2019); <u>Pizarro v. Bd. of Correction</u>, 2018 WL 3462512, at *4 (S.D.N.Y. July 17, 2018); <u>France v. Morton</u>, 2018 WL 1276860, at *9 (S.D.N.Y. Mar. 9, 2018); <u>see also</u> <u>Beale v. Madigan</u>, 668 F. App'x 448, 449 (4th Cir. 2016) (per curiam) (citation and internal quotation marks omitted) ("[I]t is appropriate to determine whether the force used was objectively reasonable in full context, as a segmented view of the events

misses the forest for the trees.").  Factors to consider in judging the objective reasonableness of a use of force include:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

Kingsley, 135 S. Ct. at 2473 (citing Graham, 490 U.S. at 396); accord Perez v. Ponte, 2017 WL 1047258, at *18 (E.D.N.Y. Feb. 14, 2017); Carmona v. City of New York, 2016 WL 4401179, at *2 (S.D.N.Y. Mar. 1, 2016).

A section 1983 plaintiff bears the burden of proving his excessive force claim.  See Rasanen v. Doe, 723 F.3d 325, 341 (2d Cir. 2013) (citations omitted) ("the burden of proof . . . in excessive force cases rests only with the plaintiff").  As with any civil case, "the plaintiff bears the burden of proving the elements of his claim by a preponderance of the evidence." Torres-Cuesta v. Berberich, 2011 WL 3298448, at *11 (E.D.N.Y. Aug. 1, 2011), aff'd, 511 F. App'x 89 (2d Cir. 2013) (citation and internal quotation marks omitted); see, e.g., Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997) (citations omitted) ("In order to succeed on a claim for damages under 42 U.S.C. § 1983 for violation of his constitutional rights, the plaintiff must show by a preponderance of the evidence that the defendant was personally involved in the constitutional violation.").  "The preponderance standard is no more than a tie-breaker dictating that when the evidence on an issue is evenly balanced, the party with the burden of proof loses." United States v. Gigante, 94 F.3d 53, 55 (2d Cir. 1996) (citations omitted).

In a bench trial, "[i]t is within the province of the district court as the trier of fact to decide whose testimony should be credited."  Krist v. Kolombos Rest. Inc., 688 F.3d 89, 95 (2d Cir. 2012) (citation omitted).  "[A]s trier of fact, the judge is entitled, just as a jury would

be, . . . to believe some parts and disbelieve other parts of the testimony of any given witness."
Id. (internal quotation marks and citations omitted); see also Newman v. Herbst, 2011 WL
684165, at *1 (E.D.N.Y. Feb. 15, 2011) ("In any bench trial, the trial judge has to evaluate the
credibility of the witnesses that testify, the witnesses' demeanor, any previous inconsistent
statements by a witness, as well as the witness's explanation for any such inconsistent
statements.").

While the relevant law is not in dispute in this case, see Pl. Br. at *1-2; Pl. Reply at *14;
Def. Br. at 21, the parties disagree about what transpired on the date of the alleged excessive
force incident, February 27, 2012.[5]

## III. FINDINGS OF FACT

The Court begins by noting that Wilson did an excellent job of presenting his case. He
also impressed the Court with his erudition and affability. More to the point, he came across as a
witness who was testifying to the best of his ability as to how he actually remembered the events
on the date of the incident, which occurred more than six years before trial. What made this case
difficult was that defendants also came across as credible witnesses.

We begin by summarizing the pertinent testimony of the witnesses at the trial and
conclude with our analysis of the evidence.

### A. Wilson

On February 27, 2012, Wilson was a pretrial detainee at the George Motchan Detention
Center at Rikers Island, New York ("GMDC"). (Wilson: Tr. 7-9). On that date, Wilson was
watching television sometime after 6:00 p.m. when C.O. Elliott arrived at his cell to escort him

---

[5] Page numbers identified by "*__" refer to the pagination provided by the Court's ECF
system.

and nine or ten other inmates down a hallway to the medication dispensary. (Wilson: Tr. 7-9, 12-13). The hallway between Wilson's housing block ("5 Upper") and the medication dispensary contains a "magnetometer,"[6] which Wilson and the others "walked around" on their way to pick up their medications, without going through it. (Wilson: Tr. 9). On the way back from the dispensary to 5 Upper, Wilson and the others, still being escorted by C.O. Elliott, were stopped "a few feet" before the magnetometer. (Wilson: Tr. 12; see id. 34 (Wilson explaining that he never went through the magnetometer on the way back from picking up his medication)). Captain France was on the scene, sitting down on a chair in front of the entrance to a different housing block, 3 Upper, as was C.O. Kinloch, who was standing next to Captain France. (Wilson: Tr. 14-15).

While standing second in the single-file line of inmates, Wilson started laughing at "something funny" his friend "Miami" had said, who was first in line. (Wilson: Tr. 15-16). At that point, and before the inmates went through the magnetometer, Captain France saw Wilson laughing, approached him along with C.O. Kinloch, and asked what Wilson was laughing at. (Wilson: Tr. 17). When Wilson responded by saying that he was simply "laughing at an inside joke," Captain France said "What you think, I'm funny? Like, you think I'm funny?" and told Wilson to "get on the wall," which Wilson understood to mean facing and placing his hands on the wall. (Wilson: Tr. 17). Wilson stated that he and Captain France then began "talking back and forth like why -- why you telling me to get against the wall?" (Wilson: Tr. 18). Nevertheless, Wilson complied, and put his "arms high up on the wall." (Wilson: Tr. 18). While Wilson was "on the wall," Captain France was "barking" in Wilson's ear on his right side

---

[6] Witnesses also referred to this machine as the "magnometer."

(Wilson: Tr. 18), and at some point — "[a]bout two minutes" later (Wilson: Tr. 20) — C.O. Calderon arrived on the scene and stood directly behind Wilson (Wilson: Tr. 19). While this was happening, Captain France ordered the rest of the inmates who had been standing in line back to their housing block (Wilson: Tr. 21), leaving just Wilson, Captain France, and C.O.s Elliott, Kinloch, and Calderon in the immediate vicinity.

Wilson testified that because his arms were "getting tired" while he was on the wall, he "slid the arms down some." (Wilson: Tr. 21). As he did so, Captain France kept talking to Wilson, "saying stuff like: I give you the green light" — which Wilson understood to mean: "if you're not going to listen to me, make a move so we can put hands on you." (Wilson: Tr. 21). Wilson said the other reason he "slid [his] hands a little bit down on the wall" was so that his arm could "block [Captain France's] face because [he] didn't even want her face looking in [his] face." (Wilson: Tr. 22). At some point after Wilson began sliding his hands down the wall, C.O. Calderon performed a "quick search" of Wilson's person, took the medication and vitamins Wilson had just picked up, "threw them down the hallway," and told Wilson to take off his shoes. (Wilson: Tr. 36). Wilson complied and removed his shoes. (Wilson: Tr. 36). Then, as Wilson continued to lower his arms, he saw Captain France "trigger[] the institutional alarm," and "nod[] to Calderon." (Wilson: Tr. 22, 24-25).

At that point, Wilson testified that C.O. Calderon punched him in the back of the head, and although he did not initially see the punch come from C.O. Calderon, Wilson knew it was him because he looked at C.O. Calderon "as soon as he did it." (Wilson: Tr. 26). After that, C.O. Calderon hit Wilson twice in his kidney area, and then once again in the back of his head. (Wilson: Tr. 27). Wilson testified that these were "hard blows," made with "a heavy-handed closed fist." (Wilson: Tr. 27-28). It was after these events that Wilson noticed that "the other

7

officers joined in." (Wilson: Tr. 28). Other officers, including C.O. Moore "came running" to the scene, and Captain France was telling Wilson to "get down." (Wilson: Tr. 29). At this point, Wilson stated, as he was trying to get down on the floor, the "officers are swinging blows, hitting me in the face," "just like a wolf pack." (Wilson: Tr. 31). "[I]t was so crazy," Wilson said, "that they were hitting each other. It was that crazy, it was pandemonium." (Wilson: Tr. 32). C.O. Moore was "part of that wolf pack" of C.O.s who were wildly "swinging punches" at Wilson. (Wilson: Tr. 39). As he tried to "get down," Wilson dropped to his knees, folding his arms behind his head (Wilson: Tr. 30-31), and ended up on his stomach (Wilson: Tr. 37). Once on the ground, Captain France kicked Wilson three times in his right shoulder, and C.O. Kinloch kicked Wilson in the face like he was "punting a football." (Wilson: Tr. 33). At least three other unidentified officers also kicked Wilson in his left ribs as he was lying on the ground on his stomach. (Wilson: Tr. 32). During this time, C.O. Elliot, while attempting to restrain Wilson's legs, began "beating [his] legs up." (Wilson: Tr. 38).

Eventually, C.O. Kinloch put his foot on Wilson's back — Wilson was still lying on the floor on his stomach — and Captain France radioed for the "probe team." (Wilson: Tr. 39). At that point, the kicking and the blows had stopped. (Wilson: Tr. 39). Once the probe team arrived, Captain France told one of the probe team members "he swung on me like that; he swung on me." (Wilson: Tr. 40). After that, the probe team led Wilson downstairs to "the intake." (Wilson: Tr. 40).

Wilson then testified to certain events that occurred after the incident. Around 8:00 p.m., a Captain Carmichael arrived at intake and took photographs of Wilson's "visible injuries." (Wilson: Tr. 40). Then Wilson saw Dr. Joon Park at the GMDC clinic about an hour later, around 9:00 p.m. (Wilson: Tr. 40). Wilson testified that Dr. Park administered some bacitracin

ointment to a cut near his eye, had him rinse the blood out of his mouth, took his blood pressure, and gave him an ice pack for facial swelling.  Then Dr. Park arranged for Wilson to see a clinic.  (Wilson: Tr. 41-42, 46).  An "injury to inmate report" listed Wilson's injuries as: "a superficial cut below [the] right eye," "scraped knees," and "left rib pain," and also indicated that Wilson was sent for x-rays to be taken.  (Tr: 145-46).  As for Wilson's description of his injuries, he testified that his ribs were "killing" him "for the next three or four months," and that sleeping on "hard mattresses" while subsequently in solitary confinement with the injured ribs was "extremely painful."  (Wilson: Tr. 43; see id. 483).  Two days later, on February 29, 2012, Wilson was sent to West Facility on Rikers Island, a medical treatment facility.  There, Wilson had x-rays taken and was diagnosed by an x-ray technician as possibly having "contused ribs," but no fractures.  (Wilson: Tr. 43).  Wilson felt sharp pain "every time [he] inhaled." (Wilson: Tr. 43-44, 102-03).

As a result of his injuries, Wilson "suffered" due to "[e]xtreme" rib pain, and the cut below his eye began healing "within a couple weeks."  (Wilson: Tr. 48-49).  At some point thereafter, Wilson was prescribed pain medication for the rib pain: Tylenol, 325 milligrams, two tabs, twice a day (or Ibuprofen) through April 3, 2012.  (Wilson: Tr. 104).  Subsequent to that, Wilson was prescribed other pain medications due to back pain, apparently stemming from the February 27 incident.  (Wilson: Tr. 106-07).  As to the degree of force used by the officers on February 27, Wilson maintained at trial that the amount of force used against him by the defendant officers was "excessive" and did not comply with "the guidelines of the DOC directives."  (Wilson: Tr. 113).

On cross-examination, Wilson testified that his bloody mouth did not appear in his medical record because he rinsed his mouth out before he arrived at the clinic.  (Wilson:

Tr. 130).  He also stated that although the initial complaint he filed stated that he suffered "soreness on the right side of [his] rib cage," that was not inconsistent with his testimony as to officers kicking the left side of his ribs (see Wilson: Tr. 32) because he had "complained about back pain, so it probably was both sides at the time.  At one point it probably was my right side was hurting too because they attacked both sides."  (Wilson: Tr. 131-32).  Wilson also stated that the transcription of his deposition testimony noting that he complained of "pain on [his] right side" was erroneous, and that the stenographer during his deposition inaccurately transcribed his statement as to where the rib pain was.  (Wilson: Tr. 133-34; see Tr. 149-51 (Wilson explaining that the inmate to injury report indicating where the rib injury occurred was incorrect)).  And as to the records having to do with Wilson's chest x-ray that came back "normal" (Tr: 147), Wilson maintained a that "normal" x-ray would not necessarily rule out "contused ribs," and would not accurately reflect the amount of pain he was in (Tr. 148-49).

### B.  Captain France

On February 27, 2012, Captain France had been employed with the New York City Department of Corrections ("DOC") for about 12 years.  (France: Tr. 181).  On that day, she was working in the "upper corridor at approximately 5:50 p.m." along with C.O.s Calderon and Moore.  (France: Tr. 186).  Captain France and C.O. Calderon were stationed near housing unit 3 Upper, which was adjacent to a magnetometer, or "mag."  (France: Tr. 187).  Although Captain France had in the past seen officers skip having inmates go through the magnetometer, going through is a required procedure.  (Tr. 251).  When she has seen officers directing inmates around the magnetometer, she has "corrected it."  (Tr. 251).

On the day of the incident, at about 5:50 p.m., Wilson "came to go through the magnetometer" and "didn't clear."  (France: Tr. 187).  Captain France stated: "some object that

he may have had in his possession alerted the staff -- myself and the officer -- that he may have something, an impermissible item on him." (France: Tr. 187). As a result of Wilson not clearing the magnetometer, he was instructed to "get on the wall" so that he could be "pat frisked." (France: Tr. 187). Captain France testified that Wilson was at first "reluctant" to get on the wall, and that he "questioned why he was going to be pat frisked because . . . it wasn't him that didn't clear," but eventually Wilson complied and got on the wall. (France: Tr. 187-88). Captain France then instructed C.O. Calderon to perform the pat frisk, whereupon Wilson started questioning her again and "took his hands down off the wall," though he started to "put his hands back up" once Captain France demanded that he do so. (France: Tr. 188). As C.O. Calderon was conducting the frisk and Wilson went to put his hands back up, "he turned around in an attempt to strike Officer Calderon." (France: Tr. 188; see id. 250-51). Captain France testified specifically that Wilson attempted to punch C.O. Calderon "only . . . once" in the "upper body" or "facial area." (France: Tr. 188). She did not see Wilson actually contact C.O. Calderon with the attempted punch, but she did see C.O. Calderon strike Wilson once "in the facial area" immediately after. (France: Tr. 188). C.O. Calderon's punch made contact with Wilson's facial area. (France: Tr. 188). Captain France testified that she did not see any other officers punch or kick Wilson, and that she never made "any physical contact" with him. (France: Tr. 191-92).

At this point, Captain France radioed for assistance and called for a probe team, which she stated was needed because "a struggle [had] ensued," and she would need to "summon for assistance to remove [Wilson] out of the area." (France: Tr. 189). As Captain France radioed for assistance, she saw C.O. Calderon apply an "upper body control hold"[7] to Wilson and saw

---

[7] An upper body control hold involves grabbing the individual sought to be controlled in the upper torso area underneath the armpits. (Kinloch: Tr. 373).

C.O. Kinloch, who at the time of the incident was escorting inmates to their housing area (France: Tr. 216), assisting C.O. Calderon in bringing Wilson to the ground due to his continued noncompliance.  (France: Tr. 189-90).  Then, the officers attempted to restrain Wilson with his hands behind his back, but had trouble doing so until C.O. Moore was able to apply "flex cuffs." (France: Tr. 190).  Shortly thereafter, the probe team arrived and escorted Wilson to intake. Captain France did not notice any injuries to Wilson at that time.  (France: Tr. 190).  She also testified that the entire incident transpired in "a matter of seconds."  (France: Tr. 249).  As to whether she could have attempted to de-escalate the situation from the start, Captain France testified that there was "no way that [she] could defuse the situation" once Wilson had been on the wall, questioned being on the wall, and turned around.  (France: Tr. 254).

On cross-examination, Captain France testified that triggering the "institutional alarm" and using a portable radio to call for assistance were just "different method[s]" to achieve the same result, namely: requesting assistance.  (France: Tr. 222).  As to two "use of force reports" completed by Captain France, Wilson questioned Captain France as to why one report noted that Wilson "failed to clear" the magnetometer, and the other noted that Wilson "walk[ed] through the magnetometer at which time he failed to comply."  (Wilson: Tr. 225-26).  Asked to explain the purported discrepancy, Captain France stated: "I don't recall.  Clear and comply is the same thing."  (France: Tr. 227).  There was also back-and-forth between Wilson and Captain France as to whether Wilson was told to put his hands "on the wall" or to place his hands above his head "facing outward," during which Captain France agreed that there were mistakes in her report as to the positioning of Wilson's hands.  (Tr: 228-34).

Captain France did not recall exactly where she was positioned during the incident, nor did she recall where C.O. Calderon was standing (to Wilson's left or right) or when C.O.

Kinloch joined in assisting Captain France and C.O. Calderon. (Tr: 239-40). Captain France denied saying anything to Wilson during the ordeal other than giving him instructions to get on the wall, and could not remember whether she told the probe team that Wilson "swung on me" once they arrived. (France: Tr. 241-43). She also did not know whether contraband was actually found on Wilson during or after the incident. (France: Tr. 247). When questioned by the Court, Captain France stated that Wilson attempted to strike C.O. Calderon with his "left hand" as he "turned to his left side." (France: Tr. 246).

    C. <u>C.O. Calderon</u>

On the date of the incident, C.O. Calderon had been employed with the DOC for around 10 years. (Calderon: Tr. 256). He was manning the upper corridor magnetometer when Wilson went through the magnetometer and triggered an alarm on the machine indicating that Wilson had contraband on his person. (Calderon: Tr. 257-58). At this time, Captain France, C.O. Calderon's supervisor at the time, ordered C.O. Calderon to pat frisk Wilson, and so C.O. Calderon ordered Wilson to "place his hands on the wall to be pat frisked, which he did." (Calderon: Tr. 258). Once the pat frisk began, Wilson said "don't fucking touch me," and "said other expletives." (Calderon: Tr. 259). Then, "towards the middle of the pat frisk," C.O. Calderon stated that Wilson "gave me an elbow," and then "spun around" and "started swinging," "throwing punches," about "three or four," towards C.O. Calderon's facial area, shoulder, and upper body. (Calderon: Tr. 259-60; <u>see</u> <u>id.</u> 286, 343 (explaining that the pat frisk was never completed)). One of the punches "grazed" C.O. Calderon's facial area, and another struck him in the right shoulder. (Calderon: Tr. 260).

In response to Wilson's swinging, C.O. Calderon testified that he punched Wilson "about three or four times" in the direction of Wilson's "upper body, inadvertently hitting his facial

area," in order to get Wilson away from him because Wilson "kept advancing" towards him and was "very aggressive." (Calderon: Tr. 261). Although he was not certain as to how many of the punches connected, C.O. Calderon surmised that it was likely two. (Calderon: Tr. 261). As to why one of the punches hit Wilson in his face, C.O. Calderon stated that although he did not mean to strike Wilson there, Wilson "must have lunged" towards him, causing a punch to land in Wilson's facial area. (Calderon: Tr. 262). At this point, the officers present tried to restrain Wilson, but since he was still "being violent," C.O. Calderon used an upper body control hold, with the assistance of C.O. Kinloch, to "guide" Wilson to the ground. (Calderon: Tr. 263-64). Once on the ground, Wilson was still resisting, so C.O.s Calderon and Kinloch grabbed Wilson's arms while C.O. Moore, who had arrived to assist, applied flex cuffs to restrict Wilson's arm movement. (Calderon: Tr. 264). C.O. Calderon testified that the probe team was called once the flex cuffs were applied by C.O. Moore. (Calderon: Tr. 264). C.O. Calderon testified that the entire incident lasted "[a]bout a minute, minute and a half at most." (Calderon: Tr. 265).

C.O. Calderon testified that he never kicked or punched Wilson once he was on the ground, nor did he see any other DOC employee kick or punch Wilson. (Calderon: Tr. 265-66). He also denied punching Wilson in the back of the head or in the kidney area. (Calderon: Tr. 265-66). C.O. Calderon did testify as to what he was thinking as the altercation with Wilson unfolded, stating:

> I just feared for my life and my safety, because I didn't know if he had any weapons on him, because he did trigger a response from the machine, so he could have had a weapon on him that he could have used to injur[e] me or staff or other inmates, God forbid.

(Calderon: Tr. 260-61). And as to why he did not first attempt to "give any verbal commands" to Wilson or attempt to use the mace he was carrying, C.O. Calderon said he did not have time,

14

as "it happened too fast," and also stated: "I feared that if I was to reach for my radio or my OC[, i.e. mace], that he would have access to my face, and I didn't know if he had a weapon on him, because he did trigger the response [from the magnetometer]." (Calderon: Tr. 262; see id. 258).

On cross-examination, Wilson questioned C.O. Calderon regarding an incident report in which C.O. Calderon had stated that on the day of the incident he had "directed [Wilson] to go back through the magnetometer and that [Wilson] failed to clear the magnetometer a second time." (Calderon: Tr. 293) (emphasis added). When Wilson questioned C.O. Calderon as to why his story had changed regarding the number of times Wilson went through the magnetometer, C.O. Calderon stated about the incident report: "that's a mistake. It was one time." (Calderon: Tr. 293). C.O. Calderon also testified on cross-examination that when Wilson turned off the wall to strike him, Wilson struck first with his "right elbow," but also stated that he did not "remember which hand actually struck me first." (Calderon: Tr. 301). Later during cross-examination, C.O. Calderon recalled the order in which Wilson struck him: "First it was the elbow, then it was the multiple punches, then the grabbing." (Calderon: Tr. 342). He also reiterated that he never punched Wilson in the back of the head. (Calderon: Tr. 337).

D. Captain Bramwell

Captain Bramwell had been working with the DOC for around 14 years on February 27, 2012. (Bramwell: Tr. 345). As part of her duties as a captain, she conducted use of force investigations. (Bramwell: Tr. 346-48). On February 27, 2012, Captain Bramwell was assigned to investigate the use of force involving Wilson. (Bramwell: Tr. 348). Captain Bramwell had an opportunity to see Wilson in person on the same day of the incident, and stated that he "appeared not to have any physical injuries." (Bramwell: Tr. 350).

E. C.O. Kinloch

On the date of the incident, C.O. Kinloch had been employed with DOC for around seven years and was the "intake escort officer" tasked with escorting inmates back to their housing units. (Kinloch: Tr. 370). At approximately 5:50 p.m., C.O. Kinloch was returning from escorting inmates back to their housing units when he observed, from approximately 20 feet away, Wilson with his hands on the wall and C.O. Calderon "attempting to pat frisk" him. (Kinloch: Tr. 371, 372). He saw that Wilson was not complying with C.O. Calderon's instructions to "keep facing the wall and stop moving his hands down." (Kinloch: Tr. 371). C.O. Kinloch testified that during a pat frisk, the protocol is for an inmate to keep one's hands still "up in the air on the wall," and to face the wall. (Kinloch: Tr. 371). Wilson was not complying with that protocol. (Kinloch: Tr. 371). Instead, according to C.O. Kinloch, Wilson "turn[ed] around facing Officer Calderon, trying to see where he's going." (Kinloch: Tr. 372). At that point, C.O. Kinloch saw Wilson "come off the wall to his right side and attempt to elbow Officer Calderon in the head area, follow through simultaneously with his left fist towards his head." (Kinloch: Tr. 372, see id. 383-84). He was not able to see whether Wilson made contact with C.O. Calderon, though he did see Wilson "swinging wildly." (Kinloch: Tr. 372). C.O. Kinloch saw C.O. Calderon "punching [Wilson]" multiple times "in the torso and abdomen area." (Kinloch: Tr. 372-73).

At that point, C.O. Kinloch went over to assist. He did so by using an "upper body control hold" to guide Wilson to the ground using his body weight. (Kinloch: Tr. 373-74). C.O. Kinloch also testified that he tried to brace Wilson's fall in order, as C.O. Kinloch put it, "to protect the safety of the plaintiff." (Kinloch: Tr. 375). In doing so, C.O. Kinloch first fell to his knee, and then Wilson's "whole upper body" landed on C.O. Kinloch's leg. (Kinloch: Tr. 375).

Once Wilson was "face down on the floor," he attempted to get up, and C.O. Kinloch stated that although he was "instructing him to stop resisting," Wilson did not comply. (Kinloch: Tr. 375). Thus, C.O.s Kinloch and Calderon utilized arm holds, and C.O. Elliott "grabbed [Wilson] by the legs" to stop him from kicking, so that C.O. Moore could employ the flex cuffs in order to restrain Wilson. (Kinloch: Tr. 375-76). After that, C.O. Kinloch and the other officers waited for the probe team. (Kinloch: Tr. 376). As to his own injuries, C.O. Kinloch received an "ACE bandage" for the knee, which had absorbed "all [of Wilson's] body weight" when he took Wilson (and himself) to the ground during the earlier struggle. (Kinloch: Tr. 377).

C.O. Kinloch stated that he never punched or kicked Wilson, and never saw anyone else, aside from C.O. Calderon, punch or kick Wilson. (Kinloch: Tr. 377-78). He also testified that he never stood over Wilson with his foot on Wilson's back, and that he was "never around [Wilson] when the probe team came." (Kinloch: Tr. 379).

F. C.O. Moore

C.O. Moore had been employed with DOC for around four years and was working at GMDC on February 27, 2012. (Moore: Tr. 388-89). C.O. Moore testified that on that day, he was working in "upper corridor B post" and became aware of an incident when he "heard loud talking by Calderon" giving Wilson orders, which were being refused. (Moore: Tr. 389). C.O. Moore, who was about 30 to 40 feet away at the time, then looked over in the direction of the altercation, saw C.O. Calderon and Wilson standing together, and noticed Wilson's "very aggressive" demeanor. (Moore: Tr. 390). At that point, C.O. Moore secured the area to which he was assigned, looked back over at the altercation, and "ran" to assist once he "saw Kinloch and Officer Calderon, like, in a tussle with the plaintiff." (Moore: Tr. 391). By the time C.O. Moore arrived, C.O.s Kinloch and Calderon were already on the ground with Wilson trying to

17

secure his arms. (Moore: Tr. 391). Once Wilson's arms were secure, and C.O. Elliott had secured Wilson's legs, C.O. Moore applied the flex cuffs. (Moore: Tr. 392-93). By that time, the probe team had arrived and intervened to take Wilson out of the area. (Moore: Tr. 393). C.O. Moore testified that he never kicked or punched Wilson, and that he never saw any DOC employee kick or punch Wilson. (Moore: Tr. 393).

On cross-examination by Wilson, C.O. Moore explained that he witnessed C.O.s Kinloch and Calderon apply an upper body control hold to Wilson in order to take him to the ground. (Moore: Tr. 398). C.O. Moore did not recall that C.O. Kinloch stood over Wilson with his foot on Wilson's back once the flex cuffs were applied. (Moore: Tr. 401).

G. C.O. Elliott

C.O. Elliott had been employed by DOC for over four years and was assigned to GMDC on February 27, 2012. (Elliott: Tr. 403). Her assignment that day was to pick up and escort inmates from their housing areas to pick up medication, ensure they took the medication, and return the inmates to their housing units. (Elliott: Tr. 403). On the date of the incident, C.O. Elliott escorted Wilson from his housing area in 5 Upper, walked down a corridor, "through [the magnetometer]," and arrived at the medication window. (Elliott: Tr. 404).

On the way back to the housing units, C.O. Elliott testified that Wilson "got into a verbal altercation, from what I heard, with Captain France and Officer Calderon." (Elliott: Tr. 404). At the time the altercation began, C.O. Elliott was around 15 to 20 feet behind Wilson, Captain France, and C.O. Calderon. (Elliott: Tr. 404-05). She heard Wilson "yelling, 'Don't fucking pat frisk me. Don't touch me,'" and C.O. Calderon telling Wilson "to put his hands on the wall." (Elliott: Tr. 405). At this point, C.O. Elliott was still focused on moving the other inmates she was escorting away from the area, but turned towards the altercation and saw Wilson "[take] a

18

swing at Calderon" as he "was trying to pat frisk him." (Elliott: Tr. 405). Although she saw that Wilson was aiming to contact C.O. Calderon "around his face," she testified that she "think[s] he missed." (Elliott: Tr. 405-06). At that point, she saw that C.O. Calderon "swung back" once, but recalled that C.O. Calderon missed. (Elliott: Tr. 406). During this time, Captain France was "telling the plaintiff to stop," but Wilson did not comply. (Elliott: Tr. 406-07). C.O. Elliott testified that she then saw C.O. Kinloch arrive from the staircase to assist C.O. Calderon in taking Wilson to the ground by using an upper body control hold. (Elliott: Tr. 407, 427). Once Wilson was on the ground, she saw that "he was moving around a lot and kicking," so C.O. Elliot thought to "grab his legs and hold his legs down so he doesn't kick anybody" by putting her arms around him and putting "a little bit of body weight on him too." (Elliott: Tr. 407-08). After that, C.O. Moore came to apply the flex cuffs and then the probe team arrived. (Elliott: Tr. 408). C.O. Elliott testified that she never punched or kicked Wilson or beat his legs, and that she did not see any officers punch or kick Wilson aside from the actions of C.O. Calderon. (Elliott: Tr. 408-09).

On cross-examination and through questioning by the Court, C.O. Elliott stated that she told Captain Bramwell after the incident that she "witnessed Captain France telling Wilson to clear the magnetometer and he refused." (Tr: 413). She also testified that Wilson went through the magnetometer at least once on the way back from the medication window, and that "it rang" at least once. (Elliott: Tr. 429). She testified that both Captain France and C.O. Calderon instructed Wilson to put his hands on the wall. (Elliott: Tr. 414). Wilson either "grabbed" or "attempted to grab" C.O. Calderon after Wilson hit C.O. Calderon. (Elliot: Tr. 417-18; see Tr. 416-21). She did not recall C.O. Kinloch standing with his left foot on Wilson's back, nor did she recall hearing Captain France say to Wilson "I give you the green light," or telling the

probe team "he swung on me."  (Elliott: Tr. 434).

On re-direct, C.O. Elliott testified that "[i]f an inmate fails to clear the magnometer," an officer has discretion to instruct the inmate to "go through a second time" — in such a case, the officer can also decide to have the inmate "pat frisked as an alternative."  (Elliott: Tr. 435).

H.  Dr. Park

Dr. Park had been working as a clinical physician at Correctional Health Services since January 2010, and was assigned to GMDC on February 27, 2012.  (Park: Tr. 447-48).  Dr. Park testified that as part of his duties he would fill out a "DOC injury report" whenever a patient was brought to the clinic for medical attention.  (Park: Tr. 448, 450).  As to his duties when an inmate arrives at the clinic after a use of force incident, Dr. Park stated that the first thing he does is to see if the "area of injury" constitutes a "minor injury" or whether it is severe.  (Park: Tr. 450).  If he determines that the patient is "mildly injured," Dr. Park does "not send [the patient for] any other secondary medical attention, such as emergency room or doing other diagnostic imaging study."  (Park: Tr. 450).  In the case of a minor injury, he "treat[s] it and then go[es] from there." (Park: Tr. 450).  If, however, Dr. Park finds that the "patient [is] severely injured, then we have a secondary access to and [have an] x-ray done right away or I'll call EMS, ambulance, to go to [the] emergency room."  (Park: Tr. 450).  In the case of a severe injury, another option exists in the form of "urgent care inside [Rikers Island]," a facility that has the ability to perform "mild emergency medical treatment."  (Park: Tr. 450).  Dr. Park usually completes a written report after an examination is finished.  (Park: Tr. 451).

Dr. Park testified that he could not remember Wilson or the examination he performed on Wilson on February 27, 2012.  (Park: Tr. 454-56; see, e.g., id. 462, 463).  Instead, his testimony about Wilson's injuries and treatment was based on his review of the DOC injury report that he

had completed after his examination, and Wilson's x-ray results. (Tr. 455-58, 466-68).

Dr. Park treated Wilson on the day of the incident and completed a written report after he was finished with the treatment. (Park: Tr. 448, 451). Based on the report, Park testified that Wilson had the following injuries: a superficial cut under Wilson's right eye that involved no bleeding (Park: Tr. 451-52); superficial abrasions to both of Wilson's knees, which involved "nothing severely cut or bruised or swelling or redness" (Park: Tr. 452); and "left rib pain" (Park: Tr. 453). Dr. Park testified that any other complaints from Wilson would have been noted on the injury report. (Park: Tr. 453). For the superficial cut below Wilson's eye, Dr. Park gave Wilson "a cold pack [to] put under the eye." (Park: Tr. 452). Wilson did not receive any treatment for the superficial knee abrasions. (Park: Tr. 452).

As for Wilson's complaints of rib pain, Dr. Park ordered "a routine chest x-ray," which he believed "was done in couple days or three days later." (Park: Tr. 453). Dr. Park testified that the x-ray "wasn't done right away because [he] believe[d] that [the] patient was stable enough to wait [a] couple more days." (Park: Tr. 453; see id. 466-67). As to the x-ray results, Dr. Park testified that, in reviewing the results, the x-ray was "normal" and did not document anything serious, such as a punctured lung. (Park: Tr. 467). When asked by the Court whether Wilson's x-ray "report [would] reflect one way or another whether he had a fracture or other injury to his rib," Dr. Park testified that a "fine coarse line, hairline fracture" would not necessarily be visible on the x-ray. (Tr: 467-70). An x-ray would also "[n]ot usually" show contused ribs. (Park: Tr. 471).

IV.  DISCUSSION

The Court is keenly aware that it is the quality — not the quantity — of evidence that matters. Thus, that in the critical aspects of the case Wilson's testimony was pitted against the

testimony of five officers was not by itself significant. Nonetheless, in the end, the Court could not fully credit Wilson's testimony as to the critical events on the day of the incident.

Starting with the injuries Wilson received, we credit the medical records showing that Wilson had only a superficial cut (that is, a cut that was not bleeding and required no stitches) under his eye that required no treatment beyond a cold pack and ointment. (See Tr: 452-53). In light of this finding, we do not find it credible that Officer Kinloch kicked Wilson in the face with a steel toed boot like he was "punting a football," as Wilson testified. (Wilson: Tr. 33-34, 45-46).

As to what led up to the incident, while Wilson maintained at trial that he never went through the magnetometer on the way back from picking up his medication (Wilson: Tr. 34), Captain France and C.O. Calderon, the two officers who were nearby or manning the magnetometer, testified that Wilson did go through the magnetometer, and that he "didn't clear" it — in other words, the machine indicated that Wilson could have had some form of contraband on him. (See France: Tr. 187; Calderon: Tr. 257-58). C.O. Elliott, who was at most 20 feet from the magnetometer, also testified to Wilson not clearing the magnetometer. (Elliott: Tr. 429). We find credible the officers' testimony that Wilson did go through the magnetometer and set off the alarm. Indeed, even Wilson himself in his briefing seems to concede that he might have gone through the magnetometer that day. See Pl. Br. at *17 ("I do not truly recall if I had gone thru the mag" after being searched).

As for the defendants, there are some aspects of their testimony that were inconsistent. To get to the most critical piece of evidence, while Captain France testified that Wilson only tried to punch C.O. Calderon once (France: Tr. 188), C.O. Calderon stated that Wilson threw three or four punches towards him (Calderon: Tr. 259-60). And while Captain France stated that

Wilson attempted to strike C.O. Calderon with his "left hand" as he "turned to his left side" (Tr. 246), C.O. Calderon stated that Wilson struck first with his "right elbow," but also stated that he did not "remember which hand actually struck me first" (Calderon: Tr. 301). Similarly, while C.O. Kinloch stated that he could not observe whether Wilson actually punched Calderon, he saw Wilson turn around off the wall and start swinging "wildly." (Kinloch: Tr. 372).

While the testimony is not consistent as to the specific nature of Wilson's first movement, it is consistent in the important respect that Wilson unjustifiably started the confrontation. If, as Wilson contends, there was a "cabal" (Wilson: Tr. 115) to make up a story about the incident, this would have been the easiest and most important piece of evidence for the three witnesses to coordinate. That there was variance seems to the Court to be more likely due to the fact that Wilson's action occurred suddenly, that it was met by an instantaneous response from C.O. Calderon, and that it occurred in fraught circumstances.

Certainly, we wonder why Wilson would take a full swing at C.O. Calderon with the intent of punching him, as there would have been no reason for him to do so. But it is equally as unlikely that the officers would attack Wilson merely for lowering his arms on the wall following a verbal exchange.

We find it more probable than not that Wilson did not merely let his hands "slid[e]" down the wall (Wilson: Tr. 24) but rather that Wilson intentionally moved his arms away from the wall in such a way that he struck C.O. Calderon in the face with his elbow, without regard to how seriously such an action would be perceived by the officers. This conclusion is bolstered by the fact that Wilson pleaded guilty to committing the offense of Harassment in the Second Degree with regard to the incident, notwithstanding Wilson's assertion that he did so out of expediency. (Wilson: Tr. 138; Def. Ex. G (Certificate of Disposition)). The violation Wilson

pleaded to, New York Penal Law § 240.26(1), includes, as minimal required conduct, that the defendant act with "intent to harass, annoy or alarm" another person, and that the defendant "strikes, shoves, kicks or otherwise subjects such other person to physical contact, or attempts or threatens to do the same."

From C.O. Calderon's perspective, he reasonably viewed the impact of Wilson's elbow on his face as an effort to engage in a physical confrontation, and that he understandably reacted by punching Wilson to defend himself and quell the threat he perceived. Wilson, perhaps also as part of a natural reaction, responded not by immediately surrendering but by trying to defend himself, including swinging his arms.

Having considered Wilson's testimony, it is possible that C.O. Calderon simply misinterpreted the level of threat that Wilson posed to him. But given that we find Wilson's elbow struck C.O. Calderon, we will not second-guess C.O. Calderon's judgment that he believed Wilson was either attacking him or preparing to attack him. See Kingsley, 135 S. Ct. at 2473 (citing Graham, 490 U.S. at 396) ("[a] court must make [the objective reasonableness] determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight").

In any event, once the exchange started, we credit the officers' testimony that their effort to take down Wilson was brief and not out of proportion to their legitimate need to subdue Wilson in light of the fact that Wilson had set off the magnetometer, ultimately failed to comply with the officers' instructions once on the wall, and stuck C.O. Calderon. As noted, Wilson's descriptions of the force are inconsistent with the very minor eye injury he exhibited. We believe that he also has exaggerated (or misremembered) the degree of force that the group of officers used to subdue him.

Wilson argues the fact that he was prescribed Tylenol and Ibuprofen and given an ice pack suggests that his injuries were more severe than the medical reports show.  See, e.g., Pl. Br. at *18; Pl. Reply at *9; (Wilson: Tr. 43, 104, 484).  But the pain for which such medication is prescribed would not be inconsistent with sustaining minor injuries after being subdued by several officers who wrestled him to the ground in their efforts to gain control of him.  (See Kinloch: Tr. 377).

More importantly, Wilson's claim that he suffered excruciating rib pain for three or four months (Wilson: Tr. 43) is completely belied by his medical records.  Those records show that Wilson went for a follow up appointment on March 7, 2012, where he "only complain[ed] of still having some pain left side ribs" and was given a prescription for five days of Ibuprofen.  (Def. Ex. K, D586-587).  Wilson visited the medical clinic a number of other times but did not request pain medication again until March 27, 2012.  (Id. at D572-581).  That time, there was a notation that the visit was not for his ribs but for his back.  (Id. at D572-D577).  Wilson injured his foot on April 1, 2012, and received a single dose of Tylenol with Codeine.  (Id. at D562-568).  On April 14, 2012, Wilson was seen by medical staff complaining again of back pain but he "denie[d]" that the pain was due to "any trauma."  (Id. at D547).  He was given a prescription for five days of Ibuprofen.  (Id.).  Wilson was seen by medical staff a number of times throughout April and May 2012, but did not make another complaint about pain until June 13, 2012.  (Id. at D502-546).  While on June 13, 2012, Wilson asserted that he had "back" pain, he again "denie[d] injury."  (Id. at D502).  In other words, Wilson's only prescription for the rib injury was Ibuprofen that he received on March 7, 2012, for a five day period.

Regarding the injuries and treatments C.O.s Calderon and Kinloch sustained and received — shoulder, knee, and hand pain for C.O. Calderon (Calderon: Tr. 265), and x-rays being taken

in addition to receiving a cold pack, an "ACE bandage," and Ibuprofen for C.O. Kinloch (Kinloch: Tr. 377) — Wilson argues that they must have resulted because the officers were kicking and punching him. Pl. Reply at *13-14. However, the officers' testimony of taking Wilson down and falling to the ground with him could have just as plausibly caused these injuries. (See Calderon: Tr. 263-64 ("[W]e actually fell to the ground when we was grabbing him, and we ended up on the ground . . . ."); Kinloch: Tr. 375 ("the first thing I fell on was my knee, and the plaintiff's whole upper body landed on my leg")).

Wilson highlights trial testimony of the defendant officers that Wilson asserts is contradictory and shows that the they are not credible. See, e.g., Pl. Br. at *3 (pointing to C.O. Elliott's allegedly incredible testimony that, referring to the process of going through the magnetometer, "'comply and clear' means the same thing"); id. at *10 (describing as implausible C.O. Kinloch's testimony that Wilson "attempted to elbow calderon, with right elbow, at his head and throw a left fist at Calderon's head, simultaneously, after turning all the way around (360 dgrees) [sic]"), id. at *14 (highlighting that C.O. Elliott at one point said that Wilson "grabbed" C.O. Calderon, and then at another point that Wilson "attempted to grab" C.O. Calderon); Pl. Reply at *5 (noting that while C.O. Calderon stated that he took Wilson down with the upper body hold, other testimony suggested that both C.O.s Calderon and Kinloch actually took Wilson down together). We find these inconsistencies to be minor given that the testimony was about an event that had occurred six years earlier and that lasted a matter of seconds.

Wilson also cites various pieces of testimony where the defendants stated that they could not recall a certain event or piece of information. For instance, he highlights the fact that the defendants could not always recall exactly how many officers were present or responded to the

26

incident. See, e.g., Pl. Brief at *11, *12. Again, given the brief and violent nature of the incident, and the long time period until trial, we do not find these gaps in memory to detract from the Court's acceptance of certain aspects of the officers' testimony.

In sum, the Court finds it more likely than not that Wilson struck C.O. Calderon with his elbow, that C.O. Calderon reasonably perceived this contact as an act of violent aggression, that C.O. Calderon reacted in a reasonable manner to counteract that aggression by punching or attempting to punch Wilson, that Wilson resisted the physical contact by striking at C.O. Calderon, and that the officers acted reasonably to subdue Wilson. With regard to the Kingsley factors specifically, the documented injuries to plaintiff were relatively minor; the force used lasted a matter of seconds and did not involve any objects or weapons; and once the exchange began between C.O. Calderon and Wilson, the other officers' actions were directed to subduing Wilson and gaining control of the situation, not in unnecessarily harming Wilson. In other words, the Court finds that each of the defendants acted reasonably under the circumstances.

V. CONCLUSION

For the foregoing reasons, we find Wilson has not proved by a preponderance of the evidence his claim of excessive force. The Clerk is directed to enter judgment dismissing this case.

SO ORDERED.

Dated: New York, New York
       March 20, 2019

GABRIEL W. GORENSTEIN
United States Magistrate Judge

27

Copy sent to:

Theodore O. Wilson, III
14-A-1163
Eastern Correctional Facility
P.O. Box 338
Napanoch, NY 12458-0338